754 A.2d 389

**William Carl LANGSTON**

v.

**Alice L. RIFFE.**

**William Carl Langston**

v.

**Sharon Locklear.**

**Danielle R.**

v.

**Tyrone W.**

Nos. 117, 137, 136, Sept. Term, 1999.

Court of Appeals of Maryland.

June 28, 2000.

398

Dawn Marie Nee (Resnick & Abraham, L.L.C., on brief), Baltimore, for appellant in Case Nos. 117 & 137 Sept. Term, 1999.

Jane C. Murphy, Cheri Wyron Levin, Renee Bronfein Ades, Family Law Clinic, University of Baltimore School of Law, Baltimore, Amicus Curiae, in support of the appellant in Case Nos. 117 & 136 Sept. Term, 1999.

C.J. Messerschmidt, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General of Maryland and Mary C. Murphy, Asst. Atty. General, on brief), Baltimore, for appellee, in Case Nos. 117 & 137 Sept. Term, 1999.

C.J. Messerschmidt, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General of Maryland and Mary C. Murphy, Asst. Atty. General, on brief), Baltimore, for petitioner, in Case No. 136 Sept. Term, 1999.

Anne C. Ogletree, Denton, Suzanne L. Hood (Suzanne L. Hood, P.A., on brief), Easton, for respondent, in Case No. 136 Sept. Term, 1999.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Three separate paternity disputes are before this Court. In each case, the man previously adjudged to be the father of a child in a prior paternity proceeding seeks to set aside that prior judgment based on alleged new evidence that he is not, or may not be, the actual father. In the first case, number 136, petitioner Danielle R. appeals from a decision of the Court of Special Appeals, which held that Tyrone R., respondent, is entitled to a court-ordered genetic or blood test and, if the test proves he is not the father of the child in question, a hearing on whether to set aside the original paternity declaration entered against him. In the cases numbered 117 and 137, appellant William Carl Langston appeals from two consolidated rulings of the Circuit Court for Baltimore City that he is not entitled to a hearing to set aside two prior paternity declarations adjudicating him to be the father of two different children. In one of those cases, he has taken a post-declaration blood test, which excluded him from being the biological father of the child in question.

## I. Facts and Procedural Background

### A. Case No. 136

Danielle R. and Tyrone W. were involved in a dating relationship from October 1987 to June 1988, during which time they engaged in sexual intercourse. At some point in the relationship, Danielle informed Tyrone she was pregnant and he was the father. On January 8, 1989, Danielle gave birth to a son, T.R. Based on his belief that he was the natural father of T.R., Tyrone entered into a paternity agreement on April 27, 1989, in which Tyrone acknowledged that he was T.R.'s

father, without requesting a blood test to determine paternity. The Circuit Court for Talbot County subsequently entered a declaration of paternity on May 9, 1989, which included an order to pay child support.

Tyrone was not aware prior to and during the paternity proceedings that Danielle had been involved in a relationship with another man, James P., before she met Tyrone. Danielle testified at the proceedings below that her relationship with James had ended in 1986. Danielle and James began dating again when T.R. was three years old. Sometime after the paternity declaration was entered, Tyrone learned about Danielle's relations with James. Tyrone testified below that he confronted her on the telephone about the relationship and alleged that Danielle threatened him that, because of his accusation, she would seek an increase in the child support he was paying "if" T.R. was Tyrone's son.

On April 7, 1998, the Talbot County Bureau of Support Enforcement and Danielle filed a petition in the Circuit Court for Talbot County to increase the child support Tyrone was paying under the 1989 paternity declaration. Tyrone responded to the petition and filed a "Complaint to Set Aside Declaration of Paternity." The complaint was based on Maryland Code (1984, 1999 Repl.Vol.), section 5–1038(a)(2)(i)2 of the Family Law Article,[1] which allows a circuit court to set aside or modify a paternity declaration "if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order." Tyrone's complaint requested blood or genetic testing to determine whether he could be excluded as the natural father of T.R.

The circuit court referred the matter to a domestic relations master. After an evidentiary hearing, the master recommended that genetic testing be conducted. The Talbot County Bureau of Support Enforcement filed exceptions with the

---

1. Future references to section 5–1038(a)(2)(i)2 are an abbreviation of Maryland Code (1984, 1999 Repl.Vol.), section 5–1038(a)(2)(i)2 of the Family Law Article, unless otherwise noted.

circuit court. Without a hearing, the circuit court rejected the master's recommendations on August 18, 1998, and dismissed Tyrone's complaint to set aside the original paternity declaration. The circuit court ruled that there was no authority in Maryland to set aside the paternity declaration absent fraud, mistake, irregularity, or clerical error. The circuit court also ruled that Tyrone had "failed to act with ordinary diligence" by waiting nine years to challenge the paternity declaration, and that Tyrone was "bound by the 1989 judgment."

Tyrone appealed to the Court of Special Appeals. That court vacated the order of the Circuit Court for Talbot County, holding that Tyrone was entitled to a blood or genetic test to determine whether he is T.R.'s biological father. The court also held that, if the tests excluded him as the biological father, he was entitled to a hearing on whether to set aside the original paternity declaration. *Tyrone W. v. Danielle R.*, 129 Md.App. 260, 300–01, 741 A.2d 553, 575 (1999). Danielle appealed to this Court, and we granted her a writ of certiorari.

### B. Case No. 117

Appellant William Carl Langston entered into a consent decree of paternity before the Circuit Court for Baltimore City on October 27, 1987. In the decree, he acknowledged that he was the father of Angela, who was born to appellee Alice Riffe, and agreed to pay child support.

Angela subsequently moved to Harford County to live with her natural grandfather, Carl Riffe. When her grandfather requested that the Harford County Department of Social Services (HCDSS) provide Angela with benefits, the HCDSS sought a paternity declaration from the Circuit Court for Harford County against appellant in July of 1997. Apparently, the HCDSS was unaware of the 1987 declaration issued in Baltimore City. A blood test was conducted, which excluded appellant as the natural father of Angela. The Circuit Court for Harford County subsequently dismissed the HCDSS paternity complaint on December 9, 1997.

Appellant was brought before the Circuit Court for Baltimore City on October 18, 1998, on a show cause order for failure to pay child support for Angela. At a contempt hearing before a master on December 16, 1998, appellant introduced into evidence the blood test results from the Harford County paternity litigation. The master recommended that the contempt proceedings be postponed to provide appellant an opportunity to challenge the 1987 paternity declaration.

Appellant filed a complaint to set aside the 1987 paternity declaration on January 7, 1999, based on section 5–1038(a)(2)(i)2. Appellee sought a dismissal of the complaint, arguing that section 5–1038(a)(2)(i)2, which was adopted by the General Assembly in 1995, could not be applied retroactively. The Circuit Court for Baltimore City ultimately ruled in favor of appellee and denied appellant's complaint to set aside the paternity declaration. A master subsequently recommended that appellant be held in contempt for the child support arrears and the circuit court agreed, issuing an order on May 6, 1999. Appellant made a timely appeal to the Court of Special Appeals. This Court granted a writ of certiorari on its own motion prior to any proceedings before the intermediate appellate court.

### C. Case No. 137

Appellant Langston also had entered into a paternity consent decree on March 22, 1985, before the Circuit Court for Baltimore City. In that decree, he acknowledged that he was the father of Jason L., the son born to appellee Sharon Locklear on December 24, 1984, and he agreed to pay child support.

A show cause order was subsequently issued to appellant for failure to pay child support. From the beginning, the proceedings in this case were consolidated with appellee Riffe's case (number 117 before this Court). Thus, the procedural steps in this appeal, and the dates on which they occurred, were virtually identical to the background described in appellee Riffe's case, *supra*. The only difference between

the cases appears to be that appellant, at the time he filed his petition for reconsideration, did not have any previous blood or genetic test excluding him as the biological father of Jason L. Rather, he alleged that he learned after the original paternity declaration was entered that appellee Locklear had engaged in sexual relations with other men around the time that Jason probably was conceived. The master recommended that his request for a genetic test be granted to determine whether he is the biological father of Jason L. The circuit court denied appellant's complaint and his request for genetic testing, appellant appealed, and we granted a writ of certiorari on our own motion.

## II. Discussion

The parties, in their appeals, present two issues to this Court, which we paraphrase as follows: (1) whether section 5–1038(a)(2)(i)2 of the Family Law Article, which allows trial courts to set aside or modify a paternity declaration when genetic or blood testing establishes that the putative father is not the actual father, applies to paternity declarations issued prior to the law's effective date on October 1, 1995; and (2) if so, whether the trial court must consider the "best interests of the child" prior to ruling on whether to allow the post-declaration blood or genetic testing and the reconsideration of paternity. The Court of Special Appeals held in respondent Tyrone's case that section 5–1038(a)(2)(i)2 applied to the prior paternity declaration. It also held that a putative father who seeks to set aside a paternity declaration automatically is entitled to a blood or genetic test. After an examination of the legislative history behind the adoption of section 5–1038(a)(2)(i)2, we agree.

### A. Retroactive Application of Section 5–1038(a)(2)(i)2

Prior to October 1, 1995, section 5–1038 read:

**§ 5–1038. Finality; modification.**

(a) *Declaration of paternity final.*—Except in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any

law, rule, or established principle of practice and procedure in equity, a declaration of paternity in an order is final.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

*See* Md.Code (1984, 1991 Repl.Vol.), § 5–1038 of the Family Law Article. In *Tandra S. v. Tyrone W.*, 336 Md. 303, 315, 648 A.2d 439, 445 (1994), this Court held that "[r]eading §§ 5–1038(a) and (b) together, it is clear that the more liberal revisory rule, § 5–1038(b), governs orders relating to paternity, but does not control the declaration of paternity itself. Rather, § 5–1038 read in its entirety makes it plain that paternity judgments are governed by the strict revisory rules set forth in [Maryland] Rule 2–535." The revisory power of Maryland Rule 2–535, which authorizes trial judges to alter or amend a final judgment, only applies within thirty days of entry of the judgment and thereafter only in the rare instances of "fraud, mistake, or irregularity." *See* Maryland Rule 2–535; *see also* Md.Code (1974, 1998 Repl.Vol.), § 6–408 of the Courts & Judicial Proceedings Article; *Tandra S.*, 336 Md. at 315–18, 648 A.2d at 445–46.

*Tandra S.*, like this case, involved multiple appeals by putative fathers seeking to overturn previous paternity declarations entered against them. One of the putative fathers in that case had taken a post-declaration blood test, which excluded him from being the biological father of the child at issue.[2] In the second case, the mother confessed to the putative father, after a paternity declaration had been entered against him, that she had committed perjury at the paternity hearing by naming him as the father. In fact, she had already legally changed the child's last name "to reflect his true lineage and parentage." *Id.* at 308, 648 A.2d at 441. Both parties in the second case subsequently sought to end the

---

2. That putative father was Tyrone W., the same man before us in case number 136 in this appeal.

putative father's child support obligation, but the Baltimore City Bureau of Support Enforcement challenged that attempt. Despite the strong, if not conclusive evidence, that neither man was the biological father in his case, the holding in *Tandra S.* precluded both men from vacating the earlier paternity declarations against them because they had not produced evidence of "fraud, mistake, or irregularity" under the narrow, common-law definitions given to those terms. *See id.* at 323, 648 A.2d at 448.

The General Assembly, in its next Regular Session, enacted 1995 Maryland Laws, Chapter 248 (hereinafter Chapter 248), specifically to overturn the effect of *Tandra S.* Chapter 248 altered section 5-1038 to allow adjudicated fathers to reopen and challenge the paternity declaration against them when they are excluded from being the biological father by a post-declaration blood or genetic test. Section 5-1038 of the Family Law Article now states:

§ 5-1038. **Finality; modification.**

(a) *Declaration of paternity final; modifications.*—(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2) (i) *A declaration of paternity may be modified or set aside:*

1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

2. *if a blood or genetic test done in accordance with § 5-1029 of this subtitle establishes the exclusion of the individual named as the father in the order.*

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the

court considers just and proper in light of the circumstances and in the best interests of the child. [Emphasis added.]

Clearly, Chapter 248 was designed to remedy the effect *Tandra S.* had on paternity declarations. In this appeal, it is for this Court to decide whether the changes implemented by Chapter 248 extend to paternity declarations entered prior to the effective date of the statute. We hold that the changes rendered by Chapter 248 apply to paternity declarations entered before October 1, 1995.

The "retroactive" or "retrospective" application of a legislative enactment has been defined in 2 Norman J. Singer, *Sutherland's Statutory Construction,* § 41.01, at 337 (5th ed. 1993): "The terms 'retroactive' and 'retrospective' are synonymous in judicial usage and may be employed interchangeably. They describe acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act." (Footnote omitted.) Concerning the retroactive application of a statute, we noted in *Spielman v. State,* 298 Md. 602, 607, 471 A.2d 730, 733 (1984):

There is "no absolute prohibition against retroactive application of a statute." [*State Comm'n on Human Relations v. Amecom Div.,* 278 Md. 120, 123, 360 A.2d 1, 4 (1976).] The question whether a statute operates retrospectively, or prospectively only, ordinarily is one of legislative intent. In determining such intent this Court has repeatedly stated, "[t]here is a general presumption in the law that an enactment is intended to have purely prospective effect. In the absence of clear legislative intent to the contrary, a statute is not given retrospective effect." *Traore v. State,* 290 Md. 585, 593, 431 A.2d 96, 100 (1981).

*See also Dashiell v. Holland Maide Candy Shops,* 171 Md. 72, 74, 188 A. 29, 30 (1936) ("It is, of course, a general principle that statutes are not to be given a retrospective effect unless their words require it. . . .").

There are exceptions to the general presumption that legislative enactments may not be applied retroactively. One such category of exceptions concerns legislative enactments that

apply to procedural changes. *See Roth v. Dimensions Health Corp.*, 332 Md. 627, 636, 632 A.2d 1170, 1174 (1993) ("Notwithstanding this presumption [against retroactivity], if the statute 'contains a clear expression of intent that it operate retrospectively, or the statute affects only procedures or remedies, it will be given retroactive application.'" (quoting *Amecom Div.*, 278 Md. at 124, 360 A.2d at 4 (citations omitted))); *Mason v. State*, 309 Md. 215, 219–20, 522 A.2d 1344, 1346 (1987) ("Despite the presumption of prospectivity, a statute effecting a change in procedure only, and not in substantive rights, ordinarily applies to all actions whether accrued, pending or future, unless a contrary intention is expressed. . . ."); *Janda v. General Motors Corp.*, 237 Md. 161, 168, 205 A.2d 228, 232 (1964) ("Ordinarily a change affecting procedure only, and not substantive rights, made by statute (and an amendment of the Maryland Rules has essentially the same effect) applies to all actions [and matters] whether accrued, pending or future, unless a contrary intention is expressed.") (alteration in original) (quoting *Richardson v. Richardson*, 217 Md. 316, 320, 142 A.2d 550, 553 (1958)), *disapproved in part on other grounds by Washington Suburban Sanitary Comm'n v. Riverdale Heights Vol. Fire Co.*, 308 Md. 556, 520 A.2d 1319 (1987); *Kelch v. Keehn*, 183 Md. 140, 144, 36 A.2d 544, 545 (1944) ("Where the effect of the statute is not to obliterate existing substantial rights but affects only the procedure and remedies for the enforcement of those rights, it applies to all actions whether accrued, pending or future, unless a contrary intention is expressed.").

The Court of Special Appeals reasoned below that Chapter 248 was not a procedural enactment. That court pointed out that the procedure for a putative father to attempt to set aside a prior paternity adjudication is the same as it was prior to Chapter 248 being enacted. The intermediate appellate court believed that Chapter 248 merely provided an additional ground on which to challenge a prior paternity declaration. *See Tyrone W.*, 129 Md.App. at 280, 741 A.2d at 564.

We note, however, that the caption to Chapter 248, as enacted, states that it is "AN ACT concerning **Paternity**

Proceedings—Procedure." [3]   In addition, the title clause states that the enactment is "[for] the purpose of . . . generally relating to paternity proceedings." The caption and title clause indicate that the Legislature believed it was placing into section 5–1038, not an additional ground, but an additional procedure or type of proceeding by which a putative father could seek a revision of a prior paternity declaration. This intention is further evidenced by the Legislature's placement of the "equitable" relief in subparagraph (a)(2)(i)1, while the "blood or genetic test" procedure was placed in subparagraph (a)(2)(i)2. Although the original procedure for revisiting paternity remains the same after Chapter 248's enactment, the methods by which revisiting the issue of paternity may be done have been expanded by the statute.  The procedure contained in section 5–1038(a)(2)(i)1 empowers the trial court to re-examine a paternity declaration under its equitable revisory powers, contained in Maryland Rule 2–535.  Subparagraph 2, however, empowers the court to set aside a paternity declaration based solely on a paternity test administered under section 5–1029 of the Family Law Article.  In other words, the methods envisioned by the different subparagraphs each involve a procedural step not contained in the other.[4]

A second exception to the general presumption against retroactive application of laws is when legislation is intended to have a remedial effect, and it does not impair vested rights.

Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries. They also include statutes intended for the correction of defects, mistakes and omissions in the civil institutions and the administration of the state.  The definition of a remedial

---

3.  The original caption stated that it was "AN ACT concerning **Family Law—Paternity Proceedings—Modification of Court Order**." The caption was modified in conference committee after substantial change to the substance of the original bill.  *See infra.*

4.  Presumably, a paternity declaration could be challenged by utilizing both of these procedures at the same time.

statute has also been stated as a statute that relates to practice, procedure, or remedies and does not affect substantive or vested rights.

Every statute that makes any change in the existing body of law, excluding only those enactments which merely restate or codify prior law, can be said to "remedy" some flaw in the prior law or some social evil. [Footnotes omitted.]

3 Norman J. Singer, *Sutherland's Statutory Construction,* *supra,* § 60.02, at 152; *see also* 2 *id.* § 41.09, at 399 ("The statutes which fall into this category [of remedial statutes] are ones that describe methods for enforcing, processing, administering, or determining rights, liabilities or status.").

█ The appellate courts of this state have also defined remedial legislation. For instance, in *Amecom Div.,* 278 Md. at 125, 360 A.2d at 5, we said that "[a]n act is remedial in nature when it provides only for a new method of enforcement of a preexisting right." (Citing *Kelch,* 183 Md. at 145, 36 A.2d at 544; *Ireland v. Shipley,* 165 Md. 90, 98, 166 A. 593 (1933)). "Under Maryland law, statutes are remedial in nature if they are designed to correct existing law, to redress existing grievances and to introduce regulations conducive to the public good." *Weathersby v. Kentucky Fried Chicken Nat'l Management Co.,* 86 Md.App. 533, 550, 587 A.2d 569, 577 (1991) (citing *State v. Barnes,* 273 Md. 195, 208, 328 A.2d 737, 745 (1974)), *rev'd on other grounds,* 326 Md. 663, 607 A.2d 8 (1992).

This raises the question of whether Chapter 248 was intended to be remedial.[5] We note first that 3 Norman J. Singer, *Sutherland's Statutory Construction, supra,* § 60.01, at 147, states: "Many statutory issues relating to family law are considered remedial. For example, one of the purposes of the Uniform Reciprocal Enforcement of Support Act, which has

---

**5.** It is possible for a piece of legislation to be both procedural and remedial. *Cf.* 2 Norman J. Singer, *Sutherland's Statutory Construction, supra,* § 41.09, at 399 ("[A] statutory amendment is remedial ... when it relates to practice, *procedure or remedies* .... " (emphasis added)); 3 *id.* § 60.02, at 152–53 ("[A] remedial statute ... relates to practice, procedures, or remedies.... The term 'remedial' is often employed to describe legislation which is procedural.... ").

been adopted by all fifty states, is to provide enforcement of the claims of nonresidential parents and children entitled to support." Singer also notes that "[t]he Uniform Parentage Act has been held to be remedial" and that "[m]odern social legislation is generally regarded as being remedial in nature." 3 *id.* § 60.02, at 154.

In determining whether Chapter 248 is remedial in nature, we look to the general tenets of statutory construction. As this Court has said time and time again, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *See, e.g., Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Although the interpretation of statutes begins with the plain language of the statute in question, *see, e.g., Jones v. State,* 357 Md. 141, 159, 742 A.2d 493, 502 (1999), we noted in *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992), that "the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears." (Citations omitted.) Review of the type mentioned in *Tracey* often consists of reviewing the materials saved in the bill files of the legislative bill ultimately adopted and enrolled as the Act in question. *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987). These rules of statutory construction presumably apply to the legislative history surrounding the intent that an Act have retroactive effect.

The legislative history of Chapter 248 clearly shows that its effects were meant to be remedial, i.e., it was intended to be applied to all paternity claims and declarations, whether prior, current, or prospective, that are rendered false by present or future blood or genetic testing. Put more simply, Chapter 248 was intended to remedy the effect of *Tandra S.* both prospectively and retrospectively.

Chapter 248 began as House Bill 337, which had a companion bill, Senate Bill 114. Materials compiled by the Depart-

ment of Legislative Reference in the bill files for both indicate the intended remedial nature of this enactment. For instance, in her testimony before the Senate Judicial Proceedings Committee, Senator Paula Hollinger, a sponsor of S.B. 114, stated:

I am not here today to testify for a bill dealing with women's rights but rather, to take a stand for men's rights. A case was brought to my attention in the early part of October 1994 when the Court of Appeals handed down a 5–2 decision on a paternity case. The highest court in Maryland ruled that a man who agreed to pay child support but later found he was not the biological father must continue paying child support. The reason for the decision according to Chief Judge Robert C. Murphy's majority opinion was that if paternity cases were not final then children would be left "fatherless and without support". Certainly no one would advocate for that situation; however, I believe there is a fairness issue at stake here and, if passed, SB 114 would amend the code to deal fairly with this issue by authorizing the court to modify or set aside a declaration of paternity under certain circumstances.

. . . .

... In light of the inequality exhibited in the recent publicized cases of 2 men who accepted paternity and child support only to discover they were not the biological father, yet had to continue support payments, I urge a favorable report on SB 114.

In addition, the bill files contain copies of three articles published shortly after the filing of the *Tandra S.* decision, which criticize the opinion or express the Maryland legal community's distaste with its result. *See* Adam Ambrose, *Paternity: A Missed Opportunity,* Daily Rec., Nov. 12, 1994; Jane Bowling, *Forcing Paternity in the Name of Finality and Expediency,* Daily Rec., Nov. 12, 1994; William Thompson, *Md. High Court's Paternity Ruling Fathers Bizarre Justice,* Balt. Sun, Oct. 24, 1994. The bill files also contain a copy of the *Tandra S.* decision. The following paragraph of Judge Eldridge's and Judge Raker's dissenting opinion appears in the bill file as shown below:

{In light of the basic differences between paternity judgments and the judgments in other types of lawsuits, the majority's holding today, in the words of the Court of Special Appeals, "defies common sense." Undoubtedly society has a strong interest in ending disputes at some point in time, and normally other interests must yield to the limitations on a court's revisory powers. Nevertheless, a completely rigid adherence to the shibboleth that "in today's highly litigious society, there must be some point in time when a judgment becomes final," in the face of irrefutable scientific evidence that a particular individual did not father a given child, with all of the attendant ramifications of such decree, is absurd. Under the majority's view, presumably if the Provincial Court of Maryland in the 1600's had issued a decree that the earth was flat, the absence of "fraud, mistake or irregularity," as narrowly defined by this Court, would make that Provincial Court decree sacrosanct. Or, if Rule 2–535(b) were to be given extra-territorial effect, presumably the March 5, 1616, decree by a tribunal in Rome, aimed at Galileo Galilei, and declaring that Copernicanism is erroneous and that the planet earth is the center of the universe, would be given conclusive effect. *Like the courts below, I do not believe that all common sense must be abandoned* in the name of Rule 2–535(b).}

*Tandra S.,* 336 Md. at 330–31, 648 A.2d at 452 (Eldridge and Raker, JJ., dissenting).

Clearly, the perceived injustices to putative fathers in situations similar to the putative fathers in the *Tandra S.* case could not be remedied by legislation with a strictly prospective effect.[6] Apparently, the Legislature agreed with the various criticisms of *Tandra S.* in the media and with Judge Eldridge's and Judge Raker's claim that the decision defied "common sense." Turning to this case, it would equally

---

6. The Legislature generally may not by statute specifically overrule a case we have finally resolved; although, provided it enacts such statute appropriately, it might be able to enact certain legislation that negates the holding it perceives to be objectionable, as to other cases.

abandon common sense to deny, once again, a putative father the ability to challenge a paternity declaration simply because he has the misfortune of having the declaration entered against him prior to October 1, 1995.

The bill files also contain more generic evidence of the Legislature's intent that Chapter 248 be applied retroactively. Originally, at their first reading, both H.B. 337 and S.B. 114 would have allowed the courts to reopen any previous paternity declaration, and any corollary judgment resulting from such litigation, if the court considered it "just and proper in light of the circumstances and in the best interests of the child" to do so. As proposed at their first reading, either bill would have completely deleted former section 5–1038(a), thus eliminating any reference to the revisory power of the trial court or the finality of the paternity declaration. Under the original S.B. 114 (Jan. 23, 1995), subsection (b) would have become the entirety of section 5–1038 and would have been amended to read: "Notwithstanding any other law or rule, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child." House Bill 337 (Feb. 2, 1995) would have amended the provision to read: "The court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child." Thus, in its original form, "House Bill 337 authorize[d] a court to modify or set aside *any* order or part of an order in a paternity proceeding that the court considers just and proper in light of the circumstances and in the best interests of the child." Department of Legislative Reference, Bill Analysis, House Bill 337 (1st ed.) (emphasis added). The "best interests of the child" provision, however, did not survive as to decisions on paternity declarations.

Senate Bill 114 remained unchanged after its passage through the Senate Judicial Proceedings Committee and its second reading. House Bill 337 had changed substantially by its second reading, however. It would have recodified section 5–1038 to read in relevant part:

(2) A declaration of paternity may be modified or set aside:

. . . .

(ii) 1. If a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the definite exclusion of the individual named as the father in the order; and

2. On a showing of fraud.

H.B. 337 (Mar. 14, 1995). As the revised Bill Analysis prepared by the Department of Legislative Reference pointed out, this version of H.B. 337 was "more narrowly drawn [than S.B. 114]. Senate Bill 114 would allow a court to modify or set aside *any* order or part of an order in a paternity proceeding, including a declaration of paternity, as the court considers just and proper in light of the circumstances and in the best interests of the child." (Emphasis added.)

After passage in their respective chambers, both bills were substantially altered again by the joint conference committee into the form ultimately adopted as Chapter 248:

AN ACT concerning

**Paternity Proceedings—Procedure**

FOR the purpose of . . . authorizing a court to modify or set aside a declaration of paternity under certain circumstances; and generally relating to paternity proceedings.

. . . .

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article—Family Law**

. . . .

5–1038.

(a) (1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2) (i) A declaration of paternity may be modified or set aside:

A.  In the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity;  or

B.  If a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.[7]

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

Thus, the final version of Chapter 248 had eliminated the original proposition that section 5–1038 allow any paternity declaration to be modified or set aside when the court considered it "just and proper" and "in the best interests of the child."  Instead, paternity declarations would be reexamined only under the revisory powers previously mentioned in section 5–1038(a), and discussed in *Tandra S.*, or when a subsequent blood or genetic test excluded the declared father from being the biological father.  The General Assembly had abandoned any reference to "best interest of the child" apparently as an effort to reject this Court's partial reliance on a "best interest" analysis in *Tandra S.*[8]  The General Assembly had abandoned the proof of fraud requirement, contained in H.B. 337, which was attached to the blood or genetic test requirement by the House Judiciary Committee prior to that bill's

7.  Subparagraphs "A" and "B" were renumbered "1" and "2" by 1997 Maryland Laws, Chapter 14.

8.  "To argue that fairness requires relitigation of the paternity question. . . .  It also overlooks the unfairness that would occur to the children if the paternity issue were allowed to be relitigated, thereby leaving the children fatherless and without support." *Tandra S.* at 325, 648 A.2d 439.

second reading. *See supra.* This indicates the Legislature's further intent to move away from requiring a putative father, who has taken a paternity test with negative results, from having to prove anything other than the results of that test.

This complex history indicates that, from the start, Chapter 248 was intended to allow a circuit court to modify or set aside "any" paternity declaration, including those entered prior to the effective date of the Act. In other words, the Legislature believed from the beginning that its enactment would apply to all paternity declarations, regardless of their date of entry. We do not think the removal of the word "any" from the final version of the enactment lessened that intent; rather, "any" declaration of paternity became "a" declaration of paternity, which was subject to review on grounds of a blood or genetic test. The changes made in the conference committee appear to have redefined the new methods upon which a putative father could challenge a paternity declaration. Moreover, the changes made did not bar the application of the bill's provisions to paternity declarations entered prior to the effective date of the Act.

The final version of Chapter 248 also rejected any consideration of the "best interests of the child" in such paternity proceedings. This is consistent with the inapplicability of a "best interests of the child" consideration in any initial paternity proceedings. Simply stated, the fact of who the father of a child is cannot be changed by what might be in the best interests of the child.

Additionally, we note that other materials in the bill file for H.B. 337 indicate that opponents to the bill were specifically concerned about its retroactive application. In a March 3, 1995 letter to the House Judiciary Committee, Patricia C. Jessamy, the State's Attorney for Baltimore City, at 1, stated that applying H.B. 337 to both legitimate and illegitimate children "would considerably broaden the impact of this section in that *all* determinations of parentage would be open to redetermination at a later date." (Emphasis added.) The Department of Human Resources also objected to the bill:

"This bill would permit disgruntled fathers the opportunity to challenge paternity judgments in thousands of Maryland child support cases."[9] Testimony of Brian Shea, Department of Human Resources on H.B. 337 to the House Judiciary Committee, at 2 (Mar. 2, 1995). While neither of these statements directly complain about the potential retroactive application of the new statute, they do infer a retroactive application in their expression of concern over the general effect the legislation would have on "thousands" of, or "all," paternity and child support cases. These concerns were apparently rejected in the final enactment.

We hold that the extensive legislative history in this case indicates that, in enacting Chapter 248, the General Assembly intended the Act to be remedial in nature. As the Court of Special Appeals pointed out below, Chapter 248 "is remedial in that it is an expansion of the equitable grounds on which a court may relieve from the effect of a paternity judgment an adjudged father who later has been determined not to be the biological father of the child in question." *Tyrone W.*, 129 Md.App. at 285, 741 A.2d at 566. More simply, it is procedural and remedial in that it relieves putative fathers from the effects of the *Tandra S.* opinion by expanding the procedure for remedying the perceived problem. In this case, it is appropriate to apply section 5–1038 retrospectively, due to the Legislature's clear intent to restore that provision to its originally intended purpose by providing

---

**9.** In many, if not most, instances, state agencies, generally the Department of Human Resources, are the driving force behind paternity actions. A mother seeking assistance for her child contacts the relevant state agency for public assistance for the child. She is informed that in order to qualify for public assistance, she must name the father and permit the agency to seek child support in her name. If the mother is certain of the father, i.e., only had sexual intercourse with one individual during the period in which conception might have occurred, he is named, the fact proven, and support arrangements made. If, however, she, as is frequently the case, does not know the father, or is uncertain as to which man, out of two or more, is the father, she is under intense pressure to name someone. If she does not name someone, she may not receive assistance for the child. Sometimes she names the wrong person. *See* footnote 15, *infra*.

putative fathers with an additional procedure or remedy to challenge prior paternity declarations.

■ We note, however, that this does not completely address whether this statute may be applied retroactively. Generally, a remedial or procedural statute may not be applied retroactively if it will interfere with vested or substantive rights. As we noted in *Janda*, 237 Md. at 168–69, 205 A.2d at 232–33:

Ordinarily a statute affecting matters or rights of substance will not be given a retrospective operation as to transactions, matters and events not in litigation at the time the statute takes effect:

"* * * unless its words are so clear, strong and imperative in their retrospective expression that no other meaning can be attached to them, or unless the manifest intention of the Legislature could not otherwise be gratified. * * * (citing cases). An amendatory Act takes effect, like any other legislative enactment, only from the time of its passage, and has no application to prior transactions, unless an intent to the contrary is expressed in the Act or clearly implied from its provisions." [*State* ] *Tax Comm. v. [Potomac Electric ] Power Company*, 182 Md. 111, 117[, 32 A.2d 382, 384 (1943) ].

... A statute, even if the Legislature so intended, will not be applied retrospectively to divest or adversely affect vested rights.... Aside from the disinclination of legislative bodies and courts to make a law operate on past events or transactions, the limitations on retroactive laws are only those which affect all legislation and, if the Legislature intends a law affecting substantive matters to operate retrospectively and the law does not offend constitutional limitations or restrictions, it will be given the effect intended.

*See also Waters Landing Ltd. Partnership v. Montgomery County*, 337 Md. 15, 29, 650 A.2d 712, 718 (1994) ("In the final part of a retroactivity analysis, a court must determine whether the retroactive application of the statute or ordinance would interfere with vested rights."); *Mason*, 309 Md. at 220, 522

A.2d at 1346 ("A statute affecting or impairing substantive rights will not operate retrospectively as to transactions, matters, and events not in litigation at the time the statute takes effect unless its language clearly so indicates."); *Beechwood Coal Co. v. Lucas*, 215 Md. 248, 253–54, 137 A.2d 680, 682–83 (1958) ("A general rule of statutory construction is that, in the absence of a clear manifestation of a contrary intent, a statute which adversely affects substantive rights will be assumed to operate prospectively rather than retrospectively."). On the other hand, where the effect of the new statute is not to impair existing substantive rights, but only to alter the procedural machinery involved in the enforcement of those rights, or the remedies available to enforce them, such legislation is usually construed as operating on all proceedings instituted after its passage, whether the right occurred before or after that date.

It is important at this stage to define substantive and vested rights. 2 Norman J. Singer, *Sutherland's Statutory Construction, supra,* § 41.09, at 56 (1999 Supp.), explains that "[a] law is substantive if it creates rights, duties and obligations, while a remedial or procedural law simply prescribes the methods of enforcement of those rights." The definition of "vested rights" is more tricky.

A most natural definition of the term "vested" is "accrued" or, as dictionaries put it, "completed and consummated." But in that sense, any claim or interest which has come into being and been perfected as "a right" would have to be said to be vested. . . .

. . . Justice Holmes once remarked with reference to the problem of retroactivity that "perhaps the reasoning of the cases has not always been as sound as the instinct which directed the decisions," and suggested that the criteria which really governed decisions are "the prevailing views of justice." The problem is to comprehend what real considerations influence judgment in application of "the prevailing views of injustice."

. . . .

... It is impossible to discover the precise meaning of the term through which all of the decisions can be consistently explained. Most of the numerous attempts at definition are essentially circuitous in nature, as in the pronouncement that "a vested right, as that term is used in relation to constitutional guarantees, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not be deprived arbitrarily without injustice." Thus "vested right" means simply a right which under particular circumstances will be protected from legislative interference. Another definition notes that a vested right is an immediate right of present enjoyment or a present fixed right of future enjoyment.

2 *id.* §§ 41.05, 41.06, at 369–70, 379 (footnotes omitted). *See Washington Nat'l Arena Ltd. Partnership v. Treasurer,* 287 Md. 38, 46 n. 4, 410 A.2d 1060, 1065 n. 4 ("[I]t has long been recognized that the term 'vested right' is conclusory—a right is vested when it has been so far perfected that it cannot be taken away by statute.") (quoting Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L.Rev. 692, 696 (1960)), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980).

Given these definitions, Chapter 248 does not appear to interfere with any substantive or vested rights in the cases *sub judice.*[10] As to substantive rights, the legislation does not grant or create any new right to putative fathers to challenge paternity declarations against them. Rather, the Act provides new methods or procedures a putative father can use to require a court to set aside an erroneous paternity declaration. The assertion of "I am not the father" has always been a defense in a paternity proceeding. Moreover, putative fathers have always possessed the right to seek to set aside paternity declarations, and the trial courts have always been empowered to do so in the appropriate case.

---

**10.** The decision in *Tandra S.* by this Court was the type of decision that conferred a vested right protected against retroactive applications of the statute.

The New Hampshire Supreme Court, in *Eldridge v. Eldridge*, 136 N.H. 611, 620 A.2d 1031 (1993), was confronted with a similar argument regarding a statute that, in enacting child support guidelines, retroactively modified the procedure by which a pre-guidelines support order could be modified. The retroactive application was challenged on constitutional grounds. The New Hampshire Supreme Court, however, responded that

[t]he statute, when applied to the facts of the present case, relates to antecedent facts, but it neither creates any new obligations nor establishes any new duties. The defendant's obligation to provide for the support of his three children, although fluid in its essence, has not changed. Rather, the statute establishes a new procedure whereby parties may seek modifications of existing child support orders. . . . [I]t simply opens up a new channel of inquiry into whether a modification is appropriate.

*Id.* at 615, 620 A.2d at 1033. In this case, the application of Chapter 248 is to antecedent facts, not substantive rights. Establishing "a new channel" by which to challenge prior paternity declarations is not the same as establishing the right to challenge them. Adjudicated fathers have always had that right.

Regarding "vested" rights, the Act does not appear to destroy or modify any vested right belonging to the children in these paternity cases. The State, on behalf of petitioner Danielle and appellees Riffe and Locklear, suggests that certain rights of the children vested upon the entry of the original paternity declarations. The State does not specify what "vested" rights those would be, but does insinuate that three rights might apply to this analysis: (1) inheritance rights; (2) Social Security benefits; and (3) child support.

As to inheritance rights, and Social Security dependent survivor's benefits, these rights are not vested by a paternity declaration against a putative father's. Rather, the rights of a child to inheritance of a putative's father estate, or from the putative father's earning of wages under the Social Security Act, vest, in the traditional sense of the word, when the

putative father dies. In respect to rights of inheritance, the purpose of paternity proceedings, particularly proceedings conducted under Maryland Code (1974, 1991 Repl.Vol., 1999 Cum.Supp.), section 1–208 of the Estates & Trusts Article is to establish, at least partially, when and through whom such rights will eventually vest. To put it more bluntly, these proceedings establish who must die for the child to be entitled to any inheritance or survivor's benefits.[11]

Regarding child support, the only vesting in monetary support that appears to occur is in support already paid by the putative father. Although we recognize that it is usually the case that a man adjudicated to be the father of a child will be ordered to pay child support, there is no right, particularly any vested right, to seek support solely from a father. A child support order accompanying a paternity declaration against a putative father, for instance, may require the mother to pay support. *See* § 5–1033(a) of the Family Law Article ("In a paternity proceeding, the court may order the father *or the mother* to pay all or part of . . . the support of the child . . . ." (emphasis added)). Nor does the child have a vested right in utilizing the Family Law Article paternity provisions to seek

---

**11.** Regarding inheritance and survivor's benefits, not relitigating the issue of paternity might have the opposite effect on the child. He could be prevented from inheriting or receiving benefits from his actual father, who might be more financially stable than the putative father. Judge Eldridge pointed out the problem, along with other potentially dire consequences, of continuing to adjudicate paternity in the wrong father in his dissent in *Tandra S.*, 336 Md. at 328, 648 A.2d at 451 (Eldridge, J., dissenting):

A judgment of paternity has continuing ramifications uncharacteristic of the typical judgment rendered by a court. In addition to providing the basis for child support, a paternity determination affects, *inter alia*, inheritance rights, citizenship, and the child's knowledge of his or her medical history. *See Locklear v. Sampson,* 478 So.2d 1113, 1115 (Fla.App.1985); *Crowder v. Com. Ex. Rel. Gregory,* 745 S.W.2d 149, 151 (Ky.Ct.App.1988). Thus, accurate determinations of paternity are critical, not simply because a child is entitled to financial support from his or her father, but also because a child may later be in need of a blood transfusion or an organ transplant from a compatible family member. A child may face decisions about marriage and childbearing based on the risk of passing on what the child believes are inherited conditions.

support. "[N]o person has a vested right in a particular remedy for enforcement of a right, or in particular modes of procedure, or rules of evidence. The legislature may pass retroactive acts changing, eliminating, or adding remedies, so long as efficacious remedies exist after passage of the act." [12] 2 Norman J. Singer, *Sutherland's Statutory Construction*, *supra*, § 41.16, at 429 (footnotes omitted).

Our holding does not apply to the support already paid by putative fathers and to the arrears they owe in support. Those property rights are already accrued. It would clearly raise problems, particularly in the areas of takings and due process, for this Court to interpret the statute to extend the retroactive application of Chapter 248 so far that a child must pay back support already claimed, adjudicated, received, and expended through a paternity-related child support, or other compensatory order, during the period it was legally in effect. Likewise, this reasoning applies to any debt owed by a putative father through the prior support or compensatory order, which is enforceable at least until the putative father initiates proceedings to attack the paternity declaration to which the order relates. *See* 2 *id.* § 41.06, at 380 ("A vested right has been equated with 'property' in order to qualify it for protection from arbitrary interference."); *cf. Washington Nat'l Arena Ltd. Partnership*, 287 Md. at 55, 410 A.2d at 1070 (holding that retroactive application of a county tax increase on property recordations to recordations made prior to the increase would "impair property rights" in violation of the federal and state constitutions); *cf. also Ferguson v. State ex. rel. P.G.*, 977 P.2d 95, 98–101 (Alaska 1999) (holding that a putative father, proven not to be the father by blood tests, was entitled only to prospective relief under Alaska's revisory rule and, thus, was still liable for child support arrearages).[13]

---

12. We also agree with the Court of Special Appeals below that "[t]here can be no vested interest in an erroneous legal declaration of paternity." *Tyrone W.*, 129 Md.App. at 291, 741 A.2d at 570.

13. In *Tandra S.*, 336 Md. at 323, 648 A.2d at 448–49, the majority noted a number of out-of-state cases in which reopening paternity was al-

### B. Entitlement to Scientific Testing in Proceedings to Set Aside Paternity Declarations

Section 5–1029 of the Family Law Article states in relevant part:

### § 5–1029. Blood or genetic tests.

. . . .

(b) *In general.*—On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

. . . .

(f) *Laboratory report as evidence.*—(1) Subject to the provisions of paragraph (3) of this subsection, the laboratory report of the blood or genetic test shall be received in evidence if:

(i) definite exclusion is established; or

(ii) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not ·biological fathers, and the

---

lowed after a negative paternity test. The Court distinguished the cases based on the broader revisory powers in those states. Chapter 248 obviously changed the context of that argument. As a result, those cases, disfavored by this Court in *Tandra S.*, are now, by reason of the 1995 statute, in accordance with our views. *See, e.g., Spears v. Spears,* 784 S.W.2d 605, 607 (Ky.Ct.App.1990) ("[I]t is our belief that to apply res judicata to preclude [the father] from challenging paternity, when blood testing has shown that he is not the father, would 'work an injustice.' "); *Department of Soc. Servs. v. Franzel,* 204 Mich.App. 385, 391, 516 N.W.2d 495, 497 (holding that a support order was "no longer equitable" after a blood test excluded the putative father), *appeal denied,* 447 Mich. 995, 525 N.W.2d 456 (1994); *see also, e.g., Ex parte State ex rel. McKinney,* 567 So.2d 366 (Ala.Civ.App.), *mandamus denied,* 575 So.2d 1024 (Ala.1990); *Locklear v. Sampson,* 478 So.2d 1113 (Fla.Dist.Ct.App.1985); *Department of Human Resources v. Browning,* 210 Ga.App. 546, 436 S.E.2d 742 (1993); *Fairrow v. Fairrow,* 559 N.E.2d 597 (Ind.1990); *Cain v. Cain,* 777 S.W.2d 238 (Ky.Ct.App.1989); *Crowder v. Commonwealth ex rel. Gregory,* 745 S.W.2d 149 (Ky.Ct.App. 1988); *Younkin v. Younkin,* 221 Neb. 134, 375 N.W.2d 894 (1985); *In re Paternity of K.,* 51 Wash.App. 131, 752 P.2d 393 (1988); *Nehls v. Nehls,* 151 Wis.2d 516, 444 N.W.2d 460 (1989).

statistical probability of the alleged father's paternity is at least 97.3%.

The issue debated by the parties is whether the mandatory blood or genetic test requirement in section 5–1029 also applies, upon motion, in a proceeding whereby an adjudicated father is attempting to set aside the paternity declaration entered against him. The putative fathers in this appeal claim it does apply, while the State, on behalf of the mothers, and *amicus curiae*, claim the trial court must first consider the "best interests of the child."

An examination of section 5–1038 and its legislative history makes clear that the "best interests of the child" standard generally has no place in a proceeding to reconsider a paternity declaration.[14] First, a plain reading of subsection (a)(2)(i)2 reveals that it cross-references to "a blood or genetic test done in accordance with § 5–1029." A reading of section 5–1029(b) then states that "[o]n the motion of ... a party to the proceeding, ... the court *shall* order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child." (Emphasis added.) The word "shall" makes it clear that, at least in a proceeding to determine paternity, or a challenge to a prior paternity declaration under section 5–1038, a blood or genetic test is to be triggered automatically when any party, including the putative father, moves to have testing conducted.

In addition, the plain language of section 5–1038(b) states that "[e ]xcept for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances *and in the best interests of the child.*" (Emphasis added.) In other words, the "best interests" standard is only to be considered by the trial court in matters corollary to the paternity declaration, such as custody, visitation, "giving bond," or "any other matter that is related to the general

14. It also has no place in the fact-driven original paternity action.

welfare and best interests of the child." *See* § 5–1035(a) of the Family Law Article (enumerating additional provisions to which a circuit court may grant an order in conjunction with a paternity declaration).

The legislative process leading to the passage of Chapter 248 emphasizes this point further. As noted, *supra*, section 5–1038 originally was to be modified by the General Assembly to require the best interests analysis in *any* attempt to review a prior paternity or paternity-related court order. Both H.B. 337 and S.B. 114, at their first reading, would have repealed and re-enacted section 5–1038 to read that a trial court "may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child." Ultimately, that language was amended so that only orders coming out of a paternity proceeding, *other than paternity declarations themselves*, could be amended when "just and proper in light of the circumstances and in the best interests of the child."

Materials in the bill files evidence the unsuccessful opposition to this modification in the statute. In a March 30, 1995 letter to Senator Walter M. Baker, Acting Executive Director of the Child Support Enforcement Administration Joan M. Knight stated, at 1: "[W]e are concerned that 'the best interests of the child' is not provided for in Section (2) and request that the bill be amended to include the best interests of the child in any decision to dissolve a declaration of paternity." Despite Ms. Knight's plea, that amendment never occurred and the "best interests of the child" standard was excluded from the determination of whether to set aside a prior paternity declaration.

The lack of a best interest standard also did not go unnoticed by Patricia C. Jessamy, the State's Attorney for Baltimore City. In her letter, *supra*, at 2, she noted:

Another additional factor to be considered is that to avoid redetermination of paternity, it is possible for courts or plaintiffs, to order or request *mandatory* blood testing in all

paternity cases. This would resolve the most frequent request in redetermining paternity, i.e. blood testing, but would also involve a substantial expenditure of public funds to cover the additional blood tests requested. [Emphasis added.]

Although she was discussing testing in the context of an original paternity proceeding, Ms. Jessamy recognized the mandatory effect of section 5–1029. We agree that, without considering cost, it might be preferable for the trial courts to require testing in the original paternity proceedings; a declaration backed by a conclusive test confirming paternity would provide greater finality, and thus stability, to Maryland's system of determining paternity.[15] The putative fathers in this case, however, did not have such testing conducted in their original hearings. To not allow testing now would violate the mandatory tenets of section 5–1029 and the Legislature's intent, in enacting Chapter 248, to provide relief to putative fathers seeking review of potentially false paternity declarations entered against them. We hold, given the legisla-

---

**15.** We also note one of the newspaper articles copied into the bill files, Bowling, *supra,* quotes University of Baltimore Law School Professor Jane Murphy, who presented an *amicus curiae* brief in this appeal on behalf of the law school's Family Law Clinic. In the article, Professor Murphy discusses a potentially better way to administer paternity cases:

"Our system kind of encourages this," ... "In order for a mother to collect AFDC [Aid to Families with Dependent Children], she has to name someone for the office of child support enforcement to go after.["]

"[Naming the father] is done under pressure, and without the formality that would encourage truthtelling."

. . . .

"Is there a better way to do it? ..." *Requiring a blood test* to verify the mother's word is one option, she says....

... [S]he adds, ... *better, more accurate determinations of paternity are the key to avoiding the judgments involved here.*

"The kind of rigidity reflected in the majority opinion is inappropriate where children are concerned," she adds, noting it is unlikely Tyrone W. or John S. will ever take more than a financial interest in their putative children's lives.

"I can see the court's concern with not making exceptions for finality of judgments," she says, "but we should either make judgments more accurate or create exceptions [for paternity cases]." [Some alterations in original.]

tive history behind Chapter 248, that the Legislature intended for blood or genetic tests to be made available, upon a motion, to any putative father seeking to challenge a paternity declaration previously entered against him in which such blood or genetic test evidence was not introduced. Moreover, an examination of the best interests of the child has no place in that determination.

We note that, when faced with similar legislative history, the Court of Appeals of Minnesota, in *Spaeth v. Warren*, 478 N.W.2d 319 (Minn.Ct.App.1991), reached the same conclusion that we do in the case *sub judice*. *Spaeth* addressed the issue of whether the best interests analysis should be applied in a pre-trial determination of whether to allow a paternity case to proceed under Minnesota's version of the Uniform Paternity Act. The court noted that "Minnesota . . . excised the portion of the UPA referencing [the] 'best interest of the child.' " *Id.* at 323. The court held that the best interest analysis was not to be considered in adjudicating paternity. *Id.* at 322.

Our holding is also bolstered by the history of the testing statute, section 5-1029. We discussed that history in *Eagan v. Ayd*, 313 Md. 265, 545 A.2d 55 (1988). *Eagan* first noted that the original paternity laws, then called "bastardy" laws, were criminal in nature because their purpose was, not only to reduce the government's cost in supporting the illegitimate child, but to punish the fornicating parents. *Eagan* then discussed the history of the testing statute:

[T]he criminal bastardy laws still were in effect in 1941 when Article 12, § 17 of the code (the predecessor to § 5–1029) came into being. . . .

The new section was enacted in order to give the court the benefit of a relatively new scientific tool—the use of blood tests to prove nonpaternity. Bowen, "Blood Tests and Disputed Parentage," 18 Md. L.Rev. 111, 115 (1958) (hereinafter Bowen). It provided:

Whenever the defendant in bastardy proceedings denies that he is the father of the child, *upon the petition of the defendant,* the court shall order that the complainant,

her child and the defendant submit to such blood tests as may be deemed necessary to determine whether or not the defendant can be *excluded* as being the father of the child. *The result of the test shall be received in evidence, but only in case definite exclusion is established* . . . . [emphasis supplied]

This new addition was patently for the benefit of the defendant. *Shanks v. State,* 185 Md. 437, 449, 45 A.2d 85, 90 (1945); Bowen, 18 Md. L.Rev. at 116–117.

*Id.* at 269–70, 545 A.2d at 56–57 (alteration in original). Many changes have been made in the paternity laws since then. First, in 1966, the criminal bastardy laws were replaced with the current civil paternity provisions (which, at that time, were codified in Article 16). The blood test statute was transferred in the process, and the provision allowing the court to order testing on its own motion was added. In 1982, changes were made in the law that allowed the mother to request testing, and made tests that conclusively proved the putative father's paternity admissible in evidence. A 1984 amendment excluded the trial court's discretion to exclude a test that confirmed paternity. *See id.* at 271–73, 545 A.2d at 57–58. We note that what has never changed in the paternity testing law is the requirement that the court provide the defendant-father with testing when he requests it, and the requirement that the tests be admitted when they conclusively prove that he is not the biological father. In fact, as *Eagan* notes, that was the original intent behind what is now section 5–1029 of the Family Law Article. To now require a trial court to conduct a best interests analysis prior to granting a blood or genetic test would counter the original and long-standing legislative intent of this statute.

Petitioner Danielle, appellees Riffe and Locklear, and *amicus curiae,* argue that a number of previous Court of Appeals decisions impliedly inject the best interests analysis into a paternity declaration. All of these cases are distinguishable, however. In *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992), the mother, Kelly Whisted, had been involved with another man, William Turner, prior to her marriage and there

was evidence that he might be the father. Her husband, Danny Whisted, was listed as the child's father on the birth certificate. The married parties separately briefly, during which time the mother lived with Turner. Eventually, the Whisteds reconciled and Kelly returned to the marital home. Mr. Turner, who had developed a relationship with the child, sought visitation rights. During the litigation that ensued, he moved the court to order blood tests to prove the paternity of the child.

We held that the trial court could grant such relief, on a showing of good cause, which we equated to a showing that the test would be "in the best interests of the child." *See id.* at 116, 607 A.2d at 940. This Court, however, reasoned that the blood test was not to be conducted under the edicts of section 5–1029, but under the illegitimacy provisions of section 1–208(b) of the Estates & Trusts Article. *See id.* at 113, 607 A.2d at 938. The Court recognized that utilizing Estates & Trusts section 1–208(b) was meant to be a " 'less traumatic' means of establishing paternity" than utilizing the Family Law Article paternity provisions. *Id.* (citing *Thomas v. Solis,* 263 Md. 536, 544, 283 A.2d 777, 781 (1971); *Dawson v. Eversberg,* 257 Md. 308, 314, 262 A.2d 729, 732 (1970)). Thus, paternity testing performed under the authority of section 1–208(b), which does not specifically mention testing, was to be ordered by a court pursuant to Maryland Rule 2–423. That rule is discretionary and is where the *Turner* decision found the "good cause" standard, which it equated to a best interests analysis, in the context of blood or genetic testing. *See id.* at 113–14, 607 A.2d at 939. Proceedings under section 5–1038(a)(2)(i)2, however, specifically require testing to be conducted pursuant to section 5–1029 of the Family Law Article. As we noted, *supra,* section 5–1029 is mandatory; it does not contain any "good cause" or other standard of review.

There is also a more obvious distinction. *Turner* involved a dispute between two different men over visitation rights. The issue of paternity was collateral to the issue disputed—visitation. Visitation is not the same as paternity, and it makes more sense for the "best interests of the child" to be consid-

ered in a visitation proceeding. In fact, if a challenge to a paternity declaration under either prong of section 5–1038(a)(2)(i) is successful, it is conceivable that situations might arise in which the trial court will have to address a prior order of visitation granted along with the original paternity declaration. As we have indicated, "except for [the] declaration of paternity," the best interests of the child may be considered: pursuant to section 5–1038(b), a paternity-related visitation order may be modified or vacated when it is "just and proper in light of the circumstances and in the best interests of the child" to do so.

*Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993), is also cited and is easily distinguishable. "Rather than being sought in an action to establish paternity, . . . the blood tests in [*Monroe*] [we]re being requested in the context of a child custody dispute between the mother of a child born out of wedlock and the man who ha[d], both before and after their marriage, acknowledged that child as his own and maintained a fatherly relationship with her." *Id.* at 766, 621 A.2d at 902. The mother sought the blood test in the hopes that it would prove that her husband was not the biological father and, thus, support her case to deny him custody of the child. As Chief Judge Bell recognized in *Monroe*, 329 Md. at 767, 621 A.2d at 902, "establishing paternity is not a necessary factor to be considered when addressing the issue of custody." *Monroe* held that the trial court had to consider the "best interests" analysis prior to ordering the test because "[w]hen a court is called upon to resolve the issue of which of the parties to a child custody action should be awarded custody of a child, the critical and overriding consideration is 'what is in the best interest of the child?' It is not simply one of several factors; rather, it is 'the objective to which virtually all other factors speak.'" *See id.* at 769, 621 A.2d at 903 (citations omitted).

The same analysis does not apply to the *fact* of paternity. As with visitation, any order of custody that accompanied an original declaration of paternity must be reviewed, if at all, pursuant to section 5–1038(b), which requires the best interests analysis. That standard of analysis is notably absent

from section 5–1038(a) and the provisions relating to an original paternity proceeding. As the Court pointed out in *Monroe*, the best interests "weighing process must be conducted where there is neither a putative father nor a presumptive father vying for the child's paternity, but only a man, who has treated the child as his own, locked in combat with the child's mother on the issue [of custody]." *Id.* at 772, 621 A.2d at 905. This is a situation far different from the paternity disputes in the appeal before us now.

Finally, *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076 (1994), involved bizarre circumstances in which the mother, during her marriage to Mr. Sider, had an extramarital affair, during which she conceived a child. After a subsequent affair of the wife, the couple initiated divorce proceedings, in which they fought over custody of the child conceived with the first paramour in the prior affair. During these proceedings, the biological father, the first paramour, was informed (by the wife's second paramour) of the impending divorce and that he might be the father of the child. The first paramour then had a blood test, which confirmed his paternity. He subsequently initiated paternity proceedings, which were stayed by the trial court pending the outcome of the custody proceedings. The trial court ultimately granted custody to the marital "father." The paternity proceedings were subsequently dismissed.

We recognized that "[a]lthough we said in *Monroe v. Monroe*, 329 Md. 758, 767, 621 A.2d 898 (1993), that 'establishing paternity is not a necessary factor to be considered when addressing the issue of custody,' *this case presents a unique situation*. Therefore, . . . we believe that the paternity issue *in the instant case* must be resolved before we can address the difficult custody issue." *Sider*, 334 Md. at 525–26, 639 A.2d at 1083 (first emphasis added). The Court held that, in the case before it, the "best interests of the child" should be considered in determining whether to allow the biological father to initiate paternity proceedings. *Id.* at 527, 639 A.2d at 1083. Given the "unique" circumstances of *Sider*, as well as *Turner* and *Monroe*, we chose not to apply or extend their

holdings further than the unique facts of those cases.[16]   This is especially true, given the legislative history we have noted, *supra,* in which the Legislature initially intended to add, but ultimately extracted the best interests standard from any later challenge to the original paternity declaration.

Interestingly, we note that the bill files contain a May 15, 1995 letter from Attorney General J. Joseph Curran to Governor Parris N. Glendening concerning the constitutionality and legal sufficiency of S.B. 114 and H.B. 337, in which the Attorney General's office recognized the distinction we have made between these prior decisions and the type of paternity challenge advanced in the cases *sub judice:*

> The Legislature could rationally believe that proceedings for child support, which result in an ongoing responsibility, are substantively different from cases involving inheritance, which end when the estate has been distributed.   This is especially true since, in the most typical case, the putative father will not be present to raise the issue or to give a blood sample.   The other types of cases that arise under [Estates & Trusts Article] § 1–208, while of many different types, also can be differentiated as they are generally adversarial and most likely will involve blood testing in the first place.   Moreover, where two men claim paternity, or where a man seeks to establish paternity against the wishes of the child's mother, there is significantly less support for the argument that a man who actively sought a declaration of paternity should subsequently be able to reverse the judgment. [Footnotes omitted.]

The types of proceedings in *Turner, Monroe,* and *Sider* are substantially different from cases in which declarations of paternity are sought.[17]   In the great majority of these cases, it

---

**16.**  In addition, the circumstances in *Sider* would now presumably be addressed by 1997 Maryland Laws, Chapter 609, which enacted section 5–1002(c) of the Family Law Article:  "Nothing in this subtitle[, "Paternity Proceedings,"] may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child."

**17.**  This distinction was also noted in Jean E. McEwen, Comment, R. McG. & C.W. v. J.W. & W.W.: *The Putative Father's Right to Standing*

is the State, on behalf of the mother, who initiates the proceeding against the putative father. As in the present cases, the State, through its various agencies, litigates the matter to conclusion in the name of the mother. And, as the letter points out, fathers often may not be present to challenge the proceeding or to provide a blood or genetic sample. Chapter 248 was intended to provide relief to such fathers by allowing them to seek paternity testing even after the paternity declaration against them has been rendered.

We further note that it would be illogical to deny a putative father the chance to receive a blood or genetic test under section 5–1029, based on a best interests analysis or otherwise, when the type of proceeding envisioned by the Legislature in adopting section 5–1038(a)(2)(i)2 requires that such testing, if requested, must be conducted in order to consider whether to exclude the complainant as the biological father. Without testing, the putative father could never succeed in his challenge to the declaration. The Court of Special Appeals pointed this out below in well-reasoned analysis:

> [T]he provision of present F.L. § 5–1038(a)(2)(i)(2) permitting a court to modify or set aside an enrolled declaration of paternity if blood or genetic testing "done in accordance with § 5–1029 of this subtitle establishes the exclusion" of the adjudged father would be meaningless if the exclusionary testing pursuant to F.L. § 5–1029 that may serve as the basis for the court's exercise of its revisory power must have been requested and obtained prior to the declaration of paternity. Obviously, if blood or genetic testing excluding the alleged father had been obtained prior to the declaration

*to Rebut the Marital Presumption of Paternity,* 76 Nw. U.L.Rev. 669, 688 (1981):

> The question of the child's best interests ... does not arise until the putative father has first been accorded his procedural right to standing to establish his paternity. This is not to say that the best interests of the child are unimportant, but only that they are irrelevant to the preliminary and essential factual determination of paternity. A successful paternity action by a putative father does not automatically entitle him to custody, for example, nor even to visitation with his child.

of paternity, there would not have been a declaration of paternity at all and the adjudged father (who would not have become "adjudged") would not be invoking the revisory power of the court under F.L. § 5–1038(a). We reject as illogical appellees' position to the contrary.

*Tyrone W.*, 129 Md.App. at 297, 741 A.2d at 573.

We hold that the provisions of section 5–1029 are mandatory once a party to any paternity proceeding moves for a blood or genetic test. This includes a post-declaration proceeding, subsequent to the initial declaration of paternity, conducted under section 5–1038(a)(2)(i)2, challenging the declaration because the putative father is not, or may not be, the biological father. Given the mandatory statutory language of section 5–1029, and the history of that section, the "best interests" analysis generally may not be conducted in determining whether to grant a motion for testing.

## C. Laches

We briefly address the issue of laches as a defense to appellant Langston's two complaints (in case numbers 117 and 137) because it was mentioned by the circuit court in its dismissal of the complaints below. First, it does not appear from the record that appellees ever raised the defense of laches for the trial court to consider. Appellees have not argued it on appeal. Thus, the issue, if it was raised below, has not been preserved. Second, we note that it would seem inequitable to apply laches in this case because appellant could have legitimately believed, prior to this appeal, that he was unable to challenge the pre–1995 paternity declarations against him with blood or genetic evidence because of *Tandra S.* In addition, as appellant points out, he was unaware of his potential complaint until, in one case, the paternity test was conducted in Harford County, and in the other case, when he learned he may not be the father of the child in question. At a minimum, a defense of laches, if raised, would have to be considered based on the delay from the time of those events.

■ Delay alone, however, is not enough to prove laches. In *Howell v. Brummell*, 293 Md. 646, 649–50, 446 A.2d 1149, 1151 (1982), a paternity case in which the father pled laches after a ten-year delay, this Court noted:

[The laches argument] is based on the contention that two potential defense witnesses became unavailable during the delay. This argument was undermined at trial by testimony which showed that one of the witnesses resided in the appellant's hometown and could have been served by the sheriff and that the appellant knew that the other was in the armed services in West Germany. Therefore, the witnesses' absence at trial was not caused by the delay. They were available to the appellant at the time of trial through subpoena or deposition.

"As was held in *Lipsitz v. Parr*, 164 Md. 222, 164 A. 743 (1933), laches is an inexcusable delay, without necessary reference to duration, in the assertion of a right, and, unless mounting to the statutory period of limitations, *mere delay is not sufficient to constitute laches, if the delay has not worked a disadvantage to another.* See *Bradford v. Futrell*, 225 Md. 512, 525, 171 A.2d 493, 500 (1961). . . . Prejudice or injury to the party raising 'laches' is an essential element. *Simpers v. Clark*, 239 Md. 395, 403, 211 A.2d 753, 757 (1965). So long as the position of the parties is not changed and there is no prejudice from the delay laches are inapplicable. *Oak Lawn Cemetery v. Baltimore County*, [174 Md. 280, 291, 198 A. 600, 605 (1938)]." *Salisbury Beauty Schools v. State Board*, 268 Md. 32, 63, 300 A.2d 367, 385 (1973) (emphasis added).

Any prejudice that resulted from the absence of the two witnesses at trial was caused by the appellant's failure to subpoena or depose them and not by the passage of time. Consequently, laches does not apply under the facts and circumstances of this case because the delay did not cause prejudice to the appellant. [Alteration in original.]

Neither the State's Attorney nor the circuit court below discussed any potential prejudice to appellees and we do not find evidence of any prejudice within the record.

## III. Summary and Effect on Remand

We hold that 1995 Maryland Laws, Chapter 248 was intended by the Legislature to be applied to all paternity cases, whenever initiated. Thus, anyone who has had a paternity declaration entered against him prior to October 1, 1995, without blood and genetic testing, generally may initiate proceedings to modify or set aside that declaration under section 5–1038(a)(2)(i)2 of the Family Law Article.[18] In those proceedings, the putative father may, by motion, request a blood or genetic test, pursuant to section 5–1029, in order to confirm or deny paternity, which is admissible in evidence under the provisions of that statute. A determination of the best interests of the child in ordering the requested testing, or in the consideration of paternity, whether original or revised, is inappropriate. Our holding today applies only to proceedings to modify or set aside a paternity declaration; an attempt to modify or set aside any other order resulting from an original paternity declaration is governed by section 5–1038(b). In addition, the holding of this Court does not necessarily affect any child support already paid or in arrears as of the date of the filing of these respective proceedings at the trial court.

Pursuant to these holdings, respondent Tyrone W. and appellant William Langston are entitled to initiate proceedings below to set aside the paternity declarations entered against them prior to October 1, 1995. In case number 117, appellant Langston has already taken a blood test, which has conclusively excluded him as the biological father. Pursuant to section 5–1029(f) of the Family Law Article, he may admit those test results into evidence at his hearing to set aside the paternity declaration. In case numbers 136 and 137, both men may seek blood or genetic tests to determine whether they are the biological fathers of the children in question. The paternity

---

18. There is a statutory exception for paternity declarations in which the putative father "acknowledged paternity knowing he was not the father." § 5–1038(a)(2)(ii). There is also an exception where, in the original paternity case, this Court rendered a final decision on the merits of the paternity issue prior to the effective date of 1995 Maryland Laws, Chapter 248.

tests should be administered and, if conclusive, admitted into evidence, pursuant to section 5–1029. If the testing excludes paternity, and the lower courts set aside either paternity judgment, the holding of this Court does not necessarily affect any child support already paid or the support arrears proven by the mothers to be due and owing as of the time of the original filings of these reconsideration proceedings in the trial court. Thus, in respondent Tyrone W.'s appeal, case number 136, we affirm the decision of the Court of Special Appeals. In cases 117 and 137, we vacate the dismissal of appellant Langston's complaints and remand the case for further proceedings.

**IN CASE NO. 136, JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY THE STATE OF MARYLAND.**

**IN CASE NOS. 117 AND 137, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY THE STATE OF MARYLAND.**

BELL, Chief Judge, Dissenting.

This Court today holds:

". . . 1995 Maryland Laws, Chapter 248 was intended by the Legislature to be applied to all paternity cases, whenever initiated.[1] Thus, anyone who has a paternity declaration entered against him prior to October 1, 1995, without blood and genetic testing, generally may initiate proceedings to modify or set aside that declaration under section 5–1038(a)(2)(i)2 of the Family Law Article. In those proceedings, the putative father may, by motion, request a blood or genetic test, pursuant to section 5–1029, in order to confirm or deny paternity, which is admissible in evidence under the provisions of that statute. A determination of the best

---

1. I agree that the Legislature intended the amendment to be retroactive. Having acted with the dispatch that it did, it is inconceivable that it would intend that any meritorious case would be left without a remedy.

interests of the child in ordering the requested testing, or in the consideration of paternity, whether original or revised, is inappropriate. Our holding today applies only to proceedings to modify or set aside a paternity declaration; an attempt to modify or set aside any other order resulting from an original paternity declaration is governed by section 5–1038(b)."

359 Md. 396, 437, 754 A.2d 389, 411. Thus, from the amendment of a statute in response to one of our decisions, which the history of the amendment indicates that the Legislature thought gave too restrictive an interpretation to the finality rule of Maryland Rule 2–535, the majority expands the right of one under a paternity order not simply to seek modification of that order, what the Legislature clearly sought to achieve, but to obtain, as a matter of right and without regard to the interests of anyone, certainly not the child who is also the subject of the order, a blood or genetic test, pursuant to a statute that has not been amended and which only addresses pre-paternity order proceedings. Because I simply cannot believe that the Legislature intended what the majority orders and because the logic of the majority's resolution of the issue this case presents escapes me, I dissent.

*Tandra S. v. Tyrone W.,* 336 Md. 303, 306, 648 A.2d 439, 440 (1994) addressed "the question whether a court can vacate an enrolled paternity judgment based on the results of a post-judgment blood test or based on the mother's post-judgment testimony that the judicially determined father is not in fact the father." The resolution of that question required the construction of Md.Code (1984, 1991 Repl.Vol.) § 5–1038 of the Family Law Article, which, at the time provided:

"(a) *Declaration of paternity final.*—Except in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity, a declaration of paternity in an order is final.

"(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside

any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child."

We concluded that a court could not vacate an enrolled judgment under the circumstances therein enumerated, reasoning,

"Reading §§ 5–1038(a) and (b) together, it is clear that the more liberal revisory rule, § 5–1038(b), governs orders relating to paternity, but does not control the declaration of paternity itself. Rather, § 5–1038 read in its entirety makes it plain that paternity judgments are governed by the strict revisory rules set forth in Rule 2–535." [2]

336 Md. at 315, 648 A.2d at 445. Under Rule 2–535(b), after thirty days, a judgment becomes enrolled and may be revised only upon a showing of fraud, mistake, or irregularity. *See* Maryland Code (1974, 1989 Repl.Vol.) § 6–408 of the Courts and Judicial Proceedings Article[3] ("[a]fter the expiration of [thirty days,] the court has revisory power and control over the judgment only in case of fraud, mistake, irregularity, or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule"). After reviewing the precedents on the meaning of fraud, mistake and irregularity, we determined that neither had been shown.

---

**2.** Maryland Rule 2–535 provides, in relevant part:

"(a) Generally. On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534.

"(b) Fraud, Mistake, Irregularity. On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity."

**3.** Maryland Code (1974, 1989 Repl.Vol.) § 6–408 of the Courts and Judicial Proceedings Article provided:

"For a period of 30 days after the entry of a judgment, or thereafter pursuant to motion filed within that period, the court has revisory power and control over the judgment. After the expiration of that period the court has revisory power and control over the judgment only in case of fraud, mistake, irregularity, or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule."

Thus, despite the reliability of the evidence to prove the petitioners' non-paternity, in one case, a blood test excluded the petitioner, Tyrone W. and, in the other, the mother, by changing the child's name shortly after the paternity to that of a man, whom she identified as the child's father, admitted that the petitioner, John S., Jr., was not the father of her child, the unfairness in each case of the result to the petitioner, and without regard to whether the adjudicated fathers acted in good faith or with ordinary diligence, 336 Md. at 323, 648 A.2d at 448, we held that the rule of finality was sacrosanct, that the result in both cases must stand, there being no exception permitting the Court to change it. As to the blood tests, noting the agreement of courts in other States, we stated:

> "The blood tests, which the circuit court relied on in vacating the judgment, do not alter this result. Rule 2–535(b) provides a circuit court with very limited revisory powers. The results of the blood test did not change the unambiguous mandate that exists in the revisory rule. Therefore, the circuit court erred when it vacated the 1990 paternity judgment and left the child fatherless because, as the circuit court itself recognized, neither fraud, mistake, nor irregularity had occurred. The majority of decisions from other jurisdictions similarly reject attempts to reopen paternity judgments based on post-judgment blood tests."

*Id.* at 320, 648 A.2d at 447. Similarly, with regard to the name change proceedings, the Court pointed out:

> "But this did not have the effect of nullifying the 1986 paternity judgment, which declared John to be the father; furthermore, it did not vest paternity in Randy. In regard to paternity and as to the parental relationship between John and the child, the name change was meaningless. *See Carroll County v. Edelmann*, 320 Md. 150, 175–76, 577 A.2d 14 (1990) (a court has no authority to terminate a parental relationship other than through a decree of adoption or guardianship). Even if it was the mother's intent to terminate John's child support payments by changing her child's name, the result would be no different. In *Stambaugh v. Child Support Admin.*, 323 Md. 106, 591 A.2d 501 (1991), we

made clear that one parent may not waive his or her child's right to support from the other parent. *Id.* at 111–12, 591 A.2d 501. *See also Stancill v. Stancill,* 286 Md. 530, 535, 408 A.2d 1030 (1979) (a court may not be handcuffed in the exercise of its duty to act in the best interests of a child by any agreement between the parents). Therefore, the mother could not unilaterally release John from his support obligations by merely changing her child's name. If the courts below concluded that the name change provided a basis for vacating the 1986 paternity judgment, we disagree.

"Moreover, if we were to uphold the lower court's decision in this case, the ramifications could be potentially disastrous. For example, what if the mother in another five years changes her statement again and testifies that John is the father? Should a court at that juncture reinstate the original paternity judgment? In this regard, the policy of finality serves an important purpose—the parties understand their respective rights and need have no concern about future developments changing their rights."

*Id.* at 322–23, 648 A.2d at 448.

We concluded:

"It is therefore clear that the overriding policy in Maryland emphasizes that once a case is decided, it shall remain decided with certain very narrow exceptions. Moreover, the majority of decisions from other jurisdictions support giving conclusive effect to a judicial finding of paternity and, therefore, are in accord with our decision today. . . .

"The result in these cases may seem harsh. Indeed, in case no. 144, Tyrone has been excluded as a possible father. Nevertheless, in each case, the 'judicially determined father' was advised of all the safeguards the law provides to prevent incorrect decisions, and waived all those rights. It is evident that each man had an adequate opportunity to obtain a fair and full adjudication of paternity in the original action, but each failed to avail himself of that opportunity. To argue that fairness requires relitigation of the paternity question totally overlooks the fact that the adjudicated

fathers in each of these cases did have a chance to contest the paternity issue but did not, choosing instead to accept the paternity determination knowing that they would be required to support their respective children. It also overlooks the unfairness that would occur to the children if the paternity issue were allowed to be relitigated, thereby leaving the children fatherless and without support.

"Moreover, we have consistently said that a court's revisory powers do not provide for the amendment of an enrolled judgment on the ground of 'fundamental unfairness.' "

*Id.* at 324–25, 648 A.2d at 449.

The dissenters noted a difference between paternity and other judgments and, therefore, urged the application of Maryland Code (1984, 1991 Repl.Vol.), § 5–1007 of the Family Law Article, which, as relevant, provided that "[a]ny rule of court or statute that relates to procedure applies to a proceeding under this subtitle only to the extent that the rule or statute is . . . (1) practical under the circumstances . . .," be applied to the review of paternity judgments. 336 Md. at 326, 648 A.2d at 450 (Eldridge, J. dissenting). But it was the rigidity of the analysis and the construction given § 5–1038, and the unfairness it generated, to which they reacted most forcefully and for which they excoriated the majority:

"In light of the basic differences between paternity judgments and the judgments in other types of lawsuits, the majority's holding today, in the words of the Court of Special Appeals, 'defies common sense.' Undoubtedly society has a strong interest in ending disputes at some point in time, and normally other interests must yield to the limitations on a court's revisory powers. Nevertheless, a completely rigid adherence to the shibboleth that 'in today's highly litigious society, there must be some point in time when a judgment becomes final,' in the face of irrefutable scientific evidence that a particular individual did not father a given child, with all of the attendant ramifications of such decree, is absurd. Under the majority's view, presumably if the Provincial Court of Maryland in the 1600's had issued a decree that the earth was flat, the absence of 'fraud, mis-

take or irregularity,' as narrowly defined by this Court, would make that Provincial Court decree sacrosanct. Or, if Rule 2–535(b) were to be given extra-territorial effect, presumably the March 5, 1616, decree by a tribunal in Rome, aimed at Galileo Galilei, and declaring that Copernicanism is erroneous and that the planet earth is the center of the universe, would be given conclusive effect. Like the courts below, I do not believe that all common sense must be abandoned in the name of Rule 2–535(b)."

*Id.* at 330–31, 648 A.2d at 452.

The same focus apparently guided the General Assembly to overrule our decision, as the majority points out. *See* 359 Md. at 412, 754 A.2d at 397. Bills for that purpose were introduced in both the House of Delegates and the Senate to address "a fairness issue at stake here." That issue was described as "the inequality exhibited in the recent publicized cases of 2 men who accepted paternity and child support only to discover they were not the biological father, yet had to continue support payments." Testimony of Senator Paula Hollinger before the House Judiciary Committee. As originally proposed both the House and Senate versions of the bill amending § 5–1038 would have permitted the modification or setting aside of paternity judgments, like any other order relating to paternity, "as the court considers just and proper in light of the circumstances and in the best interests of the child." Under that formulation, former § 5–1038(b) was amended to delete the exception for a declaration of paternity from its coverage. That approach was abandoned in favor of the present version, which more closely addresses one of the fact patterns addressed in *Tandra S.* The General Assembly elected to retain the present format and amend only § 5–1038(a). Thus, § 5–1038(b) was left unchanged and § 5–1038(a) was amended to effect the changes deemed necessary to remedy the unfairness. Section 5–1038 now provides:

"(a) *Declaration of paternity final; modifications.*—

"(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

"(2)(i) A declaration of paternity may be modified or set aside:

"1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

"2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

"(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

"(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child."

*See,* Md.Code (1984, 1999 Repl.Vol.), § 5–1038 of the Family Law Article.

Section 5–1038 (a) must be read in context to avoid an unintended result. So read, it becomes clear that § 5–1038(a)(2) can neither mean, nor be read to mean, that the Legislature intended the mandatory language of § 5–1029, which applies to the initial determination of paternity, to result in an absolute entitlement to blood tests for anyone who desires and seeks to modify or set aside a declaration of paternity. As this Court has previously observed, statutory interpretation

"begins with the words of the statute, read in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence. When the language is clearly consistent with the apparent purpose of the statute and the result is not absurd, no further research is required. Moreover, the analysis of the statute's language must be undertaken from a commonsensical rather than a technical, per-

spective, always seeking to avoid giving the statute a strained interpretation or one that reaches an absurd result."

*See Bane v. State,* 327 Md. 305, 308–09, 609 A.2d 313, 314–15 (1992) (citations and internal quotes omitted). Present § 5–1038(a), like former § 5–1038(a), albeit in more detail, prescribes when a court may modify or set aside a paternity order. It permits such order to be modified or set aside as other orders or decrees of an equity court, subsection (a)(i) 1, or when a blood or genetic test, "done in accordance with § 5–1029" excludes the person named in the order as the father. The amendment, mirroring the Legislature's intent, is quite specific: it provides a mechanism to avoid the harsh results in *Tandra S.* by expanding the circumstances in which the court may modify a paternity order; it does no more nor any less. Most assuredly, the amendment does not deal with entitlement of a person named in a paternity decree to a blood or genetic test under § 5–1029 or provide any support for the notion, advanced by the majority, that blood or genetic tests may now be ordered on demand, in aid of a requested modification of a paternity order, for any, or no, reason, other than the uncertainty that the man may now have concerning his paternity of a child as to whom the court entered the paternity order.

To be sure, § 5–1038 does refer to § 5–1029 and a blood or genetic test done in accordance with that section. That is, however, a most slender reed on which to rely for the proposition that the Legislature, by amending § 5–1038, and only that section, intended not only to address the unfairness of the finality rule but, at the same time, to allow any disaffected father under a paternity order to challenge that order and automatically to be assisted in making the challenge by being entitled to § 5–1029's mandatory blood or genetic test provision. The reed becomes even more slender when it is recalled that § 5–1029 addresses the pre-paternity order situation, when there has been no determination of who the father is; it simply does not apply to the situation that exists in the case *sub judice*, where paternity has been determined, albeit by

agreement, and after the time when a blood or genetic test could have, and would have, been ordered, had it been requested.

Section 5–1029 provides:

"(a) (1) The Administration may request the mother, child, and alleged father to submit to blood or genetic tests.

"(2) if the mother, child, or alleged father fails to comply with the request of the Administration, the Administration may apply to the circuit court for an order that directs the individual to submit to the tests.

"(b) On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

"(c) The blood or genetic tests shall be made in a laboratory selected by the court from a list of laboratories provided by the Administration.

"(d) The laboratory shall report the results of each blood or genetic test in writing and in the form the court requires.

"(e) A copy of the laboratory report of the blood or genetic test shall be provided to the parties or their counsel in the manner that the court directs.

"(f) (1) Subject to the provisions of paragraph (3) of this subsection, the laboratory report of the blood or genetic test shall be received in evidence if:

"(i) definite exclusion is established; or

"(ii) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%.

"(2) A laboratory report is prima facie evidence of the results of a blood or genetic test.

"(3) (i) Subject to the provisions of subparagraph (ii) of this paragraph, the laboratory report of the blood or genetic test is admissible in evidence without the presence of a

doctor or technician from the laboratory that prepared the report if the report:

"1. is signed by the doctor or technician who prepared or verified the report; and

"2. states that the result of the blood or genetic test is as stated in the report.

"(ii) When the laboratory report of the blood or genetic test is admitted in evidence, a doctor or technician from the laboratory that prepared the report is subject to cross-examination by any party to the proceeding if the party who desires cross-examination has subpoenaed the doctor or technician at least 10 days before trial.

"(4) A laboratory report received into evidence establishing a statistical probability of the alleged father's paternity of at least 99.0% constitutes a rebuttable presumption of his paternity.

"(g) if any individual fails to submit to a blood or genetic test ordered by the court, that refusal, properly introduced in evidence:

"(1) shall be disclosed to the court; and

"(2) may be commented on by counsel.

"(h) (1) unless indigent, the party who requests a blood or genetic test or who secures the appearance in court of a doctor or technician from the laboratory that prepared the report of the blood or genetic test is responsible for the cost of the test and the costs associated with the court appearance. However, if the requesting party prevails in the proceeding, the court shall assess the cost of the blood or genetic test or the costs associated with the court appearance against the other parties to the proceeding.

"(2) if any party chargeable with the cost of the blood or genetic test or the costs associated with court appearance is indigent, the cost of the blood or genetic test or the costs associated with the court appearance shall be borne by the county where the proceeding is pending, except to the extent that the court orders any other party to the proceeding to pay all or part of the cost.

"(3) Subject to the right of any party to subpoena a custodian of records at least 10 days before trial, a written statement from the laboratory that prepared the report of the blood or genetic test concerning the cost of the test and the cost associated with the court appearance shall be admissible in evidence without the presence of a custodian of records and shall constitute prima facie evidence of the costs.

"(i) upon motion of the Administration or any party to the proceeding and due consideration by the court, the court shall pass a temporary order for the support of the child if:

"(1) a laboratory report establishes a statistical probability of paternity of at least 99.0%; and

"(2) the court determines that the putative father has the ability to provide temporary support for the child.

As even a cursory review of § 5–1029 makes evident, there is more to § 5–1029 than section (b), relating to the ordering of a blood or genetic test. Of particular relevance to the reference in § 5–1038(a) is, I believe, sections (c), (d), (e), and (f), pertaining to where the test is to be conducted, how reported and the effect of the results. It is to these provisions that I think the Legislature clearly had reference, not section (b).

There is yet another reason why I do not believe the Legislature intended the result the majority reaches. The statute provides for modification of the order in the event that a named father obtains a blood or genetic test excluding him as the father; it does not require that such a test be obtained. Had the Legislature intended to facilitate challenges to paternity orders, it undoubtedly would have amended § 5–1029 to provide for testing of fathers named in paternity orders or it would have stated its intention that that be done more clearly in § 5–1038; to provide for the absolute entitlement to blood or genetic testing after a legal determination of paternity has been made, the General Assembly could, and, I submit, would, have clearly stated in § 5–1038(a) that, although already determined to be the father, a man nevertheless has an absolute right to a blood or genetic test, thus clearly rejecting the best interest of the child standard. I cannot believe that it chose

this method, at best circuitous and ambiguous, to accomplish something so important and with such potential for mischief, not only to the children who might be affected, but to the system itself.[4]

Moreover, the intent the majority attributes to the Legislature is inconsistent with the purpose driving the amendment in the first place. Senator Hollinger, in her testimony before the House Judiciary Committee disavowed any intention to leave children "fatherless and without support," one of the reasons given by Chief Judge Murphy for the decision, which he authored, in *Tandra S.* Under the majority view, it is quite possible that many children could be left "fatherless and without support," at least from their parent.[5]

---

4. It is not inconceivable, and, indeed, quite probable, that there will be a number of requests for blood and genetic tests made by men who agreed to paternity, but, now, behind in payments or perhaps regretting the initial decision, will take a shot at obtaining a modification; after all, they have nothing to lose and everything to gain. The only losers under the majority opinion are the children. This is ironic since the policy of this State as to those children has been stated clearly:
   "Purpose.—The purpose of this subtitle is:
   (1) to *promote the general welfare and best interests of children* born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;
   (2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and
   (3) to *simplify the procedures for determining paternity,* custody, guardianship, and responsibility for the support of children born out of wedlock." (Emphasis added)

5. The majority cites a letter contained in the Senate bill file from Joan M Knight, Acting Executive Director of the Child Support Enforcement Administration, for the proposition that the Legislature "excluded [the best interest of the child standard] from the determination of whether to set aside a prior paternity declaration." 359 Md. at 426, 754 A.2d at 405. That letter states, "[W]e are concerned that 'the best interest of the child' is not provided for in Section (2) and request that the bill be amended to include the best interests of the child in any decision to dissolve a declaration of paternity." Aside from the fact that it is inappropriate to discern legislative history from such a document, it in no way necessarily reflecting the views held by even one Legislator, when read in context of the "fairness issues" and "inequality" in

The majority holds that the best interest of the child has no role to play in the decision to modify or set aside a paternity order. Underlying this holding is the majority's interpretation of § 5–1038(a) to require blood or genetic testing to be ordered pursuant to § 5–1029.[6] I do not quarrel with the proposition that the best interest of the child is not implicated when a blood test is ordered under the latter section. That section, as I have shown, governs the situation when paternity is still an open question, when there has been neither agreement nor adjudication of the fact. In that situation, the

*Tandra S.* that the amendments to § 5–1038(a) were designed to address, however, and the overall purpose of subtitle 10, the letter was more likely dismissed and rejected as a misinterpretation of the statute. Most assuredly, if concerns raised in the letter were considered to be a valid interpretation of the statute, the Legislature would likely have more clearly rejected the application of the best interest of the child standard in § 5–1038(a) and more explicitly provided for modification of paternity blood or genetic testing procedures in § 5–1029, specifically by, most probably, precluding consideration of the child's welfare before the test is ordered. Absent these changes, § 5–1038(a)(2) cannot mean that the Legislature intended the mandatory language of § 5–1029 to result in an absolute entitlement to blood tests in cases where a declaration of paternity is sought to be modified or set aside.

6. The majority also states:
   "[T]he plain language of section 5–1038(b) states that *"[e]xcept for a declaration of paternity,* the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances *and in the best interests of the child."* (Emphasis added.) In other words, the "best interests" standard is only to be considered by the trial court in matters corollary to the paternity declaration, such as custody, visitation, "giving bond," or "any other matter that is related to the general welfare and best interests of the child." *See* § 5–1035(a) of the Family Law Article (enumerating additional provisions to which a circuit court may grant an order in conjunction with a paternity declaration)."
   359 Md. at 426, 754 A.2d at 405. Despite proposed revisions by both the House and the Senate, § 5–1038(b) went unchanged in the final version of the statute. Thus, the best interest of the child standard continues to apply in those areas where it applied prior to § 5–1038's amendment. The decision not to change the language, at most, suggests that the Legislature decided to embrace the overall goals and purpose of the statute, favoring finality of paternity judgments. It does not suggest at all that the Legislature intended to address the applicability of the best interest of the child standard when the issue is the petitioner's right to a blood or genetic test.

question is one of historical fact, which, until decided, cannot have anything to do with the child's best interest.

A different situation is presented, however, after paternity has been determined, whether by agreement or adjudication. Then, the best interest of the child necessarily is involved. The historical fact of parentage no longer stands alone; now it is intertwined with the interests of the child and no longer is capable of separation. Once paternity is established, § 5–1029 has no further role to play in that arena. The amendment to § 5–1038 does not change that, in my view, without, as there is not in this case, an amendment making it so. Contrary to the majority view, while the amendment permits the modification of paternity judgments when there has been blood or genetic testing and it excludes the named father, it does not address the named father's entitlement to such testing and, consequently, it does not restrict the consideration of the best interest of the child before any post-paternity blood or genetic testing is ordered. Thus, whether, after paternity has been determined, there will be, or should be, a blood test ordered is not a question directed to § 5–1029, but to the trial judge, to be decided in light of the relevant circumstances, including, therefore, the best interests of the child.

The cases *sub judice* are exactly the type of cases in which our case law dictates, and the General Assembly envisioned, that the best interest of the child standard would be applied. Through no fault of their own, the children in these cases have been forced into highly stressful paternity proceedings that may significantly impact the rest of their lives. Ironically, while they are at the center of these disputes, the records contain no information about where they live, where they go to school, whether they are healthy, what their current family life is like or even whether they are aware of these proceedings. Moreover, the records contain little or no information about the relationship between the children and their legal fathers, who would disown them, or whether the blood tests will promote a relationship with a new parent. More disturbing, these proceedings are occurring more than ten years after the paternity of the children has been determined legally, poten-

tially disrupting any stability in their family life, and destroying any confidence they may have in our legal system. In my view, even though permitted to modify a paternity order on a more liberal basis than before, "the discretion to modify or set aside otherwise final orders merely because they are entered in a paternity case is a remedy which must be exercised with the utmost caution." *Jessica G. v. Hector M.*, 337 Md. 388, 401, 653 A.2d 922, 929 (1995). This caution must include considering the welfare of the child.

Maryland has consistently required that the best interest of the child standard be applied in matters affecting the welfare of children. *See, e.g., Pangle v. Pangle*, 134 Md. 166, 170, 106 A. 337, 338 (1919) (holding that the primary concern in deciding child custody cases is promoting the child's highest welfare); *Turner v. Whisted*, 327 Md. 106, 117, 607 A.2d 935, 940 (1992) (holding that the best interest of the child is the "paramount concern" in determining whether to order blood tests to determine paternity); *Monroe v. Monroe*, 329 Md. 758, 773, 621 A.2d 898, 905 (1993) (holding that the trial court erred by not considering whether ordering blood tests to disestablish paternity was in the best interest of the child); *Sider v. Sider*, 334 Md. 512, 527, 639 A.2d 1076, 1083 (1994) (holding that "the 'best interest of the child standard' should be used in deciding whether to grant a paternity petition"); *Adoption/Guardianship No. 10941*, 335 Md. 99, 113, 642 A.2d 201, 208 (1994) (holding that a child's interest supercedes that of its natural parents).

To be sure, this Court must presume that the Legislature was aware of the body of case law applying the best interest of the child standard when it enacted, and subsequently amended, § 5–1038(a). *See City of Baltimore v. Hackley*, 300 Md. 277, 283, 477 A.2d 1174 (1984); *Board of Educ., Garrett Co. v. Lendo*, 295 Md. 55, 63, 453 A.2d 1185 (1982); *Williams v. State*, 292 Md. 201, 210, 438 A.2d 1301 (1981). Indeed, reading this Court's precedents regarding the application of the best interest of the child standard in paternity proceedings involving blood test requests, *see Turner v. Whisted, supra*, 327 Md. 106, 607 A.2d 935, *Monroe v. Monroe, supra*, 329 Md. 758, 621

A.2d 898, and *Sider v. Sider, supra,* 334 Md. 512, 639 A.2d 1076, together with § 5–1038(a), as revised, makes clear that the best interest of the child standard remains applicable. It is significant, I repeat, that while making amendments the Legislature did not provide for, or even address, the petitioner's entitlement to testing in § 5–1038(a). It is also significant that § 5–1029 outlines procedures for the initial paternity hearing, not its subsequent modification.

Yet the majority ignores the significant impact these proceedings may have on the children involved. Here, via a modification proceeding, the trial courts are presented with a conflict between a valid paternity determination, resulting from court proceedings, and a claim of non-paternity, for the confirmation of which a blood test conducted in accordance with § 5–1029 is sought. Contrary to the majority view, the prior legal determination of paternity makes the decision to order a blood test, not a simple one to determine a biological fact, but an enormously complex decision affecting the welfare of the child whose paternity is at issue. The result of the blood test may require the modification of a former declaration, or, where the parties are married to each other and the child is born during the marriage, presumption of paternity, and the uprooting of a child's foundation, potentially resulting in significant mental, emotional and psychological stress to the child. As this Court noted in *Monroe v. Monroe, supra:*

> "Significant to the best interest determination is the desirability, from the child's perspective, of establishing that the man that is the only father the child has ever known . . . and who has acknowledged the child, is, in fact, not the child's father. *The effect of that determination is not only to establish that the person who the child regarded as her father, is, in fact, not her father, but also to establish that she has no known father.*"

329 Md. at 773, 621 A.2d at 905 (emphasis added). Hardly can one argue that the General Assembly intended that the best interest of children under these circumstances be disregarded or ignored, especially where paternity has been legally declared ten years prior.

Under the majority view, the trial court is required, mechanically, to order a blood test and thus risk disturbing a legally established paternity judgment, irrespective of the impact the test may have on the child or the child's family life. In my view, even with the technological advances and resulting increased certainty of identifying the biological parents through blood testing and DNA analysis, courts still must respect and consider the "best interest of the child" and make a determination independently based on the facts in the record before ordering blood tests. *See Monroe, supra,* 329 Md. at 769, 621 A.2d at 903 (holding that "when information which potentially undermines the best interest of the child, as well as the interest sought to be protected by the legitimation statutes, and the policy of this State, it must first be tested in light of [the best interest of the child] standard"). *See also, Turner, supra,* 327 Md. at 117, 607 A.2d at 940.

Many of our sister states agree. For example, the Supreme Court of Kansas when addressing whether blood tests should be conducted in a paternity action involving competing presumptions of paternity held that prior to deciding whether to order blood tests to determine whether a presumed parent is the biological parent, the trial court must consider the best interests of the child, including its physical, mental, and emotional needs. *In Re Marriage of Ross,* 245 Kan. 591, 783 P.2d 331, 338–339 (1989). In that case, a mother brought a paternity action on behalf of her child against both her former husband and the alleged biological father. When blood tests proved that the alleged biological father was in fact the biological father, the trial court ordered him to pay child support and granted joint custody to the mother and her former husband. *Id.* at 333–34. The Kansas intermediate appellate court affirmed the trial court ruling but held that a best interest of the child evidentiary hearing did not have to be held before making such a determination. *Id.* at 334. Criticizing the intermediate court for placing judicial economy ahead of bastardizing a child, the Supreme Court of Kansas reversed the intermediate appellate court with regard to the application of the best interest of the child standard conclud-

ing that "[t]he mere filing of a paternity action does not automatically imply that the action is in the child's best interests. A court must reach this conclusion independently based on the facts in the record." *Id.* at 339.

Similarly in *McDaniels v. Carlson*, 108 Wash.2d 299, 738 P.2d 254 (1987), the Supreme Court of Washington addressing competing presumptions of paternity held that:

> "the mere filing of a paternity action does not automatically imply that the action is in the child's best interest. A court must reach this conclusion independently based on the facts in the record and the recommendations of the guardian ad litem appointed to represent the interests of the child."

*Id.* at 262. There, the plaintiff sought blood tests to establish his paternity of a child born while the mother of the child was married to another man. While holding that it was necessary for the trial court to consider the impact of a paternity action on the child before the paternity proceedings, the Supreme Court of Washington reasoned:

> "Child development experts widely stress the importance of stability and predictability in parent/child relationships, even where the parent figure is not the natural parent. .... A paternity suit, by its very nature, threatens the stability of the child's world. We are concerned that the best interests of the child standard, too broadly interpreted, could become a blanket license for any person to disrupt long-fostered family relationships by claiming to be the parent of a child. It may be true that a child's interests are generally served by accurate, as opposed to inaccurate or stipulated, paternity determinations. However, it is possible that in some circumstances a child's interests will be even better served by no paternity determination at all. The best interests of the child standard does not entitle a court to presume that paternity determination is automatically in the child's best interest. Therefore, absent a showing that such determination is in fact within the child's best

interests, this standard cannot be invoked on behalf of someone other than the child."

*Id.* at 261. (citations omitted).

Other courts have followed the sound reasoning in *McDaniels* and *Ross*. *See, In re Paternity of "Adam,"* 273 Mont. 351, 903 P.2d 207, 211 (1995) (holding that the best interest of the child was the proper standard to apply in determining whether blood tests should be conducted); *M.F. v. N.H.*, 252 N.J.Super. 420, 599 A.2d 1297 (A.D.1991) (holding that although a putative father had standing to bring a paternity action, the action could not proceed and the blood tests could not be ordered, unless the trial court determined that the paternity action would serve the best interest of the child.); *Weidenbacher v. Duclos*, 234 Conn. 51, 661 A.2d 988, 993 (1995) (recognizing that the best interest of the child is a paramount consideration in determining whether to order blood tests); *Ban v. Quigley*, 168 Ariz. 196, 812 P.2d 1014, 1017 (App.1990) (holding that the trial court must specifically consider whether it would be in the best interest of the child for the case to proceed before a putative father may be permitted to seek blood tests in an attempt to rebut the presumption of paternity). Moreover, although not specifically interpreting the Family Law Article at issue here, this Court in *Turner, supra,* 327 Md. 106, 607 A.2d 935, citing with approval *McDaniels* and *Ross,* held that a motion for a blood test to determine paternity was impeded, but not absolutely precluded, by a presumption that a minor was the legitimate child of the man to whom the natural mother was married at the time of birth, and therefore, the trial court could have and should have held a hearing to determine whether ordering a blood test would be in the best interest of the child. *Id.* at 117, 607 A.2d at 940. *See also, Monroe, supra,* 329 Md. at 771, 621 A.2d at 904.

In support of its position that the best interest of the child should not be considered here, the majority relies on one intermediate appellate court decision from the state of Minnesota. *See, Spaeth v. Warren,* 478 N.W.2d 319 (Minn.Ct.App. 1991). It argues that the *Spaeth* court, under similar facts

and interpreting a statute with similar legislative history,[7] held that the best interest analysis was not to be considered in adjudicating paternity. *See id.* at 322. *Spaeth,* however, is distinguishable. What's more, it emphasizes more the unfortunate result reached in this case and does little to support the majority's position.

*Spaeth* involved a challenge to a summary judgment order granted in favor of the undisputed father in a paternity action. There, the trial court did not join the child or the child's mother's husband as a party and it did not consider the best interest of the child in its determination. *Id.* at 321–22. The mother of the child and her current husband appealed arguing that the trial court should have applied the best interest of the child standard before making a judgment of paternity. The appellate court rejected this argument and affirmed the trial court ruling, reasoning that "[a] child's best interests simply are irrelevant to the biological determination." *Id.* at 323.

Unlike the present cases, *Spaeth* did not involve a challenge to a legal judgment of paternity, nor did it involve a challenge to a presumption of paternity. Where there are conflicting presumptions of paternity, Minnesota courts, consistent with a significant majority of courts throughout the country, have clearly distinguished the holding in *Spaeth* and consistently applied the best interest of the child standard. *See Kelly v. Cataldo,* 488 N.W.2d 822, 826 (Minn.App.1992) (clarifying that *Spaeth* 's rejection of the best interest of the child standard is not applicable precedent where there are conflicting presumptions of paternity.); *Matter of Welfare of C.M.G.,* 516 N.W.2d 555, 560 (Minn.App.1994) (applying the best interest of the child standard in determining whether a blood test should be conducted to establish paternity and holding that "[w]here competing presumptions of paternity exist, the determination of paternity in no longer solely an issue of biological fact."); *Murphy v. Myers,* 560 N.W.2d 752, 756 (Minn.App.1997) (upholding the application of the best interest of the child stan-

---

7. *See* UPA § 13, 9B U.L.A. 320 (1987); Minn.Stat. § 257.64 (1990).

dard in paternity action where trial court ordered blood tests be conducted).

The facts in *Spaeth* are not only distinguishable, but they illustrate a flaw in the majority's analysis that cannot be supported by the legislative history of the statute. Assuming *arguendo* a similar factual scenario as that in *Spaeth* occurred in Maryland, applying the majority view in this case, the "undisputed" father who has been legally recognized as the parent of the child may decide at any time after the paternity judgment to reopen the proceedings by demanding a blood test based on little more than a newly developed hunch that he is not the biological father, without regard to the best interest of the child, so long as he did not acknowledge paternity knowing he was the father. *See* § 5–1038(a)(2)(ii). In addition, another man may, provided he has standing, reopen the legal determination of paternity by demanding a blood test, also without regard to the best interest of the child. I am convinced that if the legislature intended such a drastic result, it would have carefully and clearly written it into the statute.

I do, as forcefully as possible, dissent.

WILNER, Judge, Dissenting.

Until October 1, 1995, Maryland law, as enunciated in Maryland Code, § 5–1038 of the Family Law Article, made clear that a declaration of paternity embodied in an order entered by a circuit court in a paternity case was final and that such a declaration could not later be modified or set aside on a motion filed pursuant to Maryland Rule 2–535(b). The declaration could be reviewed in a timely-filed direct appeal and, presumably, on a motion filed pursuant to Maryland Rule 2–534 or 2–535(a), but once 30 days elapsed without the noting of an appeal or the filing of a motion under one of those rules, the declaration of paternity became truly final and unreviewable. That was our holding in *Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994). Because of the wording of § 5–1038, the authority of a circuit court to revise its judgments under Maryland Rule 2–535(b) upon a showing of due dili-

gence and either fraud, mistake, or irregularity did not apply to declarations of paternity, and thus, even if the person declared to be the father could later prove through blood or genetic testing that he was not, in fact, the father, the declaration was not subject to revision or abrogation.

The General Assembly decided to change that law, and thus enacted 1995 Md. Laws, ch. 248. The Act, as finally adopted, authorized the court to modify or set aside a declaration of paternity (1) in the manner and to the extent that any order of an equity court is subject to the revisory power of the court, *or* (2) if a blood or genetic test done in accordance with § 5–1029 of the Family Law Article established the exclusion of the individual named as the father in the paternity order. The one limitation imposed was that a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing that he was not the father. The Act took effect October 1, 1995.

The Legislature gave no indication in the 1995 amendment that it was to apply to orders or declarations of paternity already in effect. Ignoring that silence, the majority concludes that the Act is, indeed, retroactive and allows persons who, prior to October 1, 1995, either acknowledged paternity or were adjudicated as the father to relitigate that issue, presumably at any time in the future. It holds that the normal presumption against retroactive application of statutes is overcome because, in its view, (1) the Legislature intended that the Act be applied retroactively and (2) retroactive application is permissible because the Act is both procedural and remedial. I most respectfully disagree with those conclusions. There is no evidence that the Legislature intended ch. 248 to operate upon declarations of paternity that had become final prior to October 1, 1995; the Act is not procedural; and although it may be regarded as remedial with respect to the men who were the subject of paternity declarations entered prior to October 1, 1995, it significantly impacts upon important substantive rights of both the mothers and the children affected by those declarations.

The established rule is that "legislative enactments are presumed to operate prospectively and are to be construed accordingly." *Granahan v. Prince George's County*, 326 Md. 346, 357, 605 A.2d 91, 97 (1992). The reason for that presumption is that "retrospective application, which attempts to determine the legal significance of acts that occurred prior to the statute's effective date, increases the potential for interference with persons' substantive rights." *Id.* (*citing WSSC v. Riverdale Fire Co.*, 308 Md. 556, 561, 520 A.2d 1319, 1322 (1987)). Accordingly, we have held that "[t]he presumption against retrospectivity is rebutted *only* where there are clear expressions in the statute to the contrary; and, even where permissible, *retrospective application is not found except upon the plainest mandate in the legislation.*" *Granahan, supra,* 326 Md. at 357, 605 A.2d at 97 (emphasis added). *See also WSSC, supra,* 308 Md. at 568, 520 A.2d at 1325 ("[U]nder the law of Maryland statutes ordinarily are construed to operate prospectively, absent a clear legislative intent to the contrary. Further, when the General Assembly intends a statute to have a retrospective application, it knows how to express that intent").

The majority's finding of legislative intent appears to be based on (1) its own view that the perceived injustice to putative fathers "could not be remedied by legislation with a strictly prospective effect," and (2) some "generic evidence" of the Legislature's intent gleaned from legislative history. The first basis articulated by the majority is simply wrong. Retroactive application is not necessary to remedy a perceived injustice. Nor is there anything in the legislative history that comes even close to establishing an intent by the General Assembly to make the 1995 amendment applicable to declarations that became final prior to the effective date of the Act.

In light of this Court's clear pronouncements on what it takes to overcome the strong presumption against retroactive application—"clear expressions in the statute," the "plainest mandate in the legislation"—it is impermissible even to root around for snippets in the bill files from which some weak inference of intent may be drawn. If the intent is not

unambiguously expressed in the statute, it may not be inferred. In searching through those files, however, the majority ignores what may be the most significant piece of evidence—the fiscal note prepared by the then-Department of Fiscal Services.

In the three years preceding the 1995 enactment, paternity case filings in the circuit courts had been averaging over 26,000 per year.[1] Even as far back as 1989–90, they had been averaging over 21,000 per year. If the 1995 amendment were retroactive, it could well apply to over a quarter million declarations, perhaps even as many as a half million. Child support enforcement actions showed at least equivalent numbers. The potential for men pursued for child support or women for a variety of other reasons to seek to relitigate the issue of paternity was enormous, indeed, overwhelming. The Department of Human Resources noted that the bill "would permit disgruntled fathers the opportunity to challenge paternity judgments in thousands of Maryland child support cases." Yet the Department of Fiscal Services, relying on information supplied by the Administrative Office of the Courts, advised the General Assembly that "[w]hile this bill could result in an increase in reopened paternity cases, it is assumed that the additional workload can be absorbed within the budgeted resources of the judiciary." If there was the slightest indication that the bill could be applied retroactively to the enormous inventory of cases closed prior to October 1, 1995, surely the Administrative Office of the Courts would have made note of that prospect and hedged its rosy fiscal advice.

In *WSSC, supra,* 308 Md. 556, 520 A.2d 1319, after confirming the general presumption against the retroactive application of statutes, we noted and confirmed what may be regarded as a converse, or at least a corollary, principle, emanating in Maryland largely from *Janda v. General Motors Corp.,* 237 Md. 161, 205 A.2d 228 (1964), that a statute governing procedure or remedy will be applied to "cases pending when the

---

1. *See* ANNUAL REPORT OF THE MARYLAND JUDICIARY (1994–95) CC–8 at 47; (1993–94) CC–8 at 47; (1992–93) CC–8 at 55.

statute becomes effective." *WSSC, supra,* 308 Md. at 564, 520 A.2d at 1322. The majority attempts to sustain the retroactive application of ch. 248 on those twin grounds—that it is both procedural and remedial—overlooking, of course, that the declarations it seeks to apply the statute to were not "pending" when the statute took effect, but had already become final.

The Act is clearly *not* procedural in nature. It neither creates nor alters any procedure for establishing or adjudicating paternity. The procedure after October 1, 1995 is precisely what it was before that date—a paternity action filed and litigated under §§ 5–1010 through 5–1044 of the Family Law Article. All that the 1995 amendment effectively does is to permit a man declared to be the father of a particular child or children to petition to reopen that declaration following a blood or genetic test that excludes him as the father. It is a substantive right that did not previously exist. Under our holding in *Tandra S. v. Tyrone W., supra,* 336 Md. 303, 648 A.2d 439, once the declaration became final, in the sense that it was no longer subject to review on appeal or pursuant to a timely filed motion under Rule 2–534 or 2–535(a), the finding of paternity was immune from relitigation. Chapter 248 afforded men the right, under limited circumstances, to relitigate that determination. It gave them a cause of action, even though in the same case, that previously did not exist. That is *not,* in my view, merely procedural.

Nor is the 1995 Act solely remedial in nature. Chief Judge Bell notes quite well the substantive aspects of the legislation. It permits the court, on the basis of evidence that, in most instances, could have been obtained earlier, to undo a legal relationship and with it, often, an emotional one as well. That was the policy choice that the Legislature made and had the right to make, but to suggest that there is no substantive aspect to the amendment is to ignore the reality of its effect. I fully understand the view expressed by the dissenting judges in *Tandra S.,* which obviously was persuasive to the Legislature, and I make no comment, one way or the other, on the merits of that view from the perspective of social policy.

Whether good policy or bad, the fact is that the accomplishment of its objective necessarily leaves children legally fatherless, sometimes emotionally fatherless, without an existing order of paternal support, and without an ability to inherit from a man previously adjudicated to be the child's father. It abrogates, as well, the support flowing to the mother or other custodian of the child. The hope that, some day, the "true" father may be discovered and substituted—the likelihood of which, I suspect, is largely remote—does not diminish the immediate substantive effect of setting aside an established paternity declaration.

For these reasons, I would hold that the 1995 amendment is not retroactive and does not apply to declarations of paternity that were final prior to October 1, 1995. I would reverse the judgment of the Court of Special Appeals in No. 136 and affirm the judgments of the Circuit Court for Baltimore City in Nos. 117 and 137.

Judge RODOWSKY has authorized me to state that he joins in this dissenting opinion.